UNITED STATES ex rel. FRIEDMAN et al. v. UNITED STATES EXPRESS CO.

(District Court, W. D. Arkansas, Ft. Smith Division. July 13, 1910.)

1. MANDAMUS (§ 133*)—INTERSTATE COMMERCE—EXPRESS COMPANIES—TRANSPORTATION OF INTOXICATING LIQUORS.

Interstate Commerce Act Feb. 4, 1887, c. 104, § 3 (24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]), makes it unlawful for any common carrier subject to the act to make or give any undue or unreasonable preference or advantage to any particular person or locality or description of traffic, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice in any respect whatsoever. Held that, where an express company doing interstate business refused shipment of intoxicating liquors offered by petitioners in Arkansas for transportation to purchasers in that portion of Oklahoma formerly called the Indian Territory, petitioners were entitled under such section to mandamus to compel the express company to transport and deliver such liquor as an article of commerce not prohibited by law from being introduced into that part of Oklahoma to which it was consigned.

[Ed. Note.—For other cases, see Mandamus, Cent. Dig. § 268; Dec. Dig. § 133.*]

2. STATES (§ 9*)—ADMISSION INTO UNION—EFFECT.

Since Congress has no power to admit a state into the Union except on an equal footing with the original states in accordance with the rights, powers, and duties defined by the Constitution, the admission of Oklahoma fixed her status and that of her people as that acquired by the other states of the federal Union, under the Constitution, anything in the enabling act (Act June 16, 1906, c. 3335, 34 Stat. 267 [U. S. Comp. St. Supp. 1909, p. 155]) to the contrary notwithstanding; and conferred on such state the exclusive power to enact its own laws, regulating intrastate commerce and in the exercise of its police power regulating the introduction and sale of intoxicating liquors.

[Ed. Note.—For other cases, see States, Cent. Dig. § 4; Dec. Dig. § 9.*]

3. COMMERCE (§ 15*)—INTERSTATE COMMERCE—SUBJECTS—INTOXICATING LIQUORS."

Intoxicating liquors are articles of commerce so far as the interstate commerce law is concerned, and hence no state may prohibit their introduction within its borders.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 15.*]

4. INDIANS (§ 35*)—INTRODUCTION OF LIQUOR INTO INDIAN TERRITORY—STATUTES—NONINTERCOURSE ACT—REPEALED.

Since by the enabling act by which Oklahoma was admitted into the Union (Act Cong. June 16, 1906, c. 3335, 34 Stat. 267 [U. S. Comp. St. Supp. 1909, p. 155]), the state was left with jurisdiction of the introduction of intoxicating liquors from Oklahoma into that part of the state

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

known as Indian Territory, and was authorized to control the sale of liquor through its own courts, the nonintercourse act (Act Cong. Jan. 30, 1897, c. 109, 29 Stat. 506), forbidding the introduction of intoxicating liquors into Indian Territory, was no longer in force in that part of Oklahoma formerly known as Indian Territory after its admission as a state so as to prevent the introduction therein of liquor from Arkansas in interstate commerce.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 61, 62; Dec. Dig. § 35.*]

Petition for mandamus by the United States, on relation of Louis Friedman and another, doing business as Friedman & Co., against the United States Express Company.     Demurrer to petition overruled.

The complainants filed their petition for a mandamus to compel the defendant to accept and transport intoxicating liquors to complainants' customers residing in that part of the state of Oklahoma commonly known as the Indian Territory.  The petition was filed under section 10 of the act of Congress approved March 2, 1889 (Act March 2, 1889, c. 382, 25 Stat. 862 [U. S. Comp. St. 1901, p. 3172]), which is as follows:

"Sec. 10. That the Circuit and District Courts of the United States shall have jurisdiction upon the relation of any person or persons, firm, or corporation, alleging such violation by a common carrier, of any of the provisions of the act to which this is a supplement and all acts amendatory thereof, as prevents the relator from having interstate traffic moved by said common carrier at the same rates as are charged, or upon terms or conditions as favorable as those given by said common carrier for like traffic under similar conditions to any other shipper, to issue a writ or writs of mandamus against said common carrier, commanding such common carrier to move and transport the traffic, or to furnish cars or other facilities for transportation for the party applying for the writ:  Provided, that if any question of the fact as to the proper compensation to the common carrier for the service to be enforced by the writ is raised by the pleadings, the writ of peremptory mandamus may issue, notwithstanding such question of fact is undetermined, upon such terms as to security, payment of money into the court, or otherwise, as the court may think proper, pending the determination of the question of fact:  Provided, that the remedy hereby given by writ of mandamus shall be cumulative, and shall not be held to exclude or interfere with other remedies provided by this act or the act to which it is a supplement."

Complainants allege, in substance, the receipt of mail orders from customers residing in that country.  Complainants put up the goods in suitable packages for shipment and transportation, marked and branded as required by the laws of the United States for the shipment of intoxicating liquors by common carriers, for shipment to various points in that portion of the state of Oklahoma, formerly called the Indian Territory, and that these packages were offered to the defendant, who is a common carrier and engaged in carrying goods from Ft. Smith, Ark., to points in that part of the state of Oklahoma formerly called the Indian Territory; that complainants had received bona fide orders as stated, and in response to said orders they tendered for shipment to said defendant the package consisting of intoxicating liquors with the amount of money charged by said express company for transportation to their customer at Manford, in that part of Oklahoma known as the Indian Territory; that said express company refused to accept said package for shipment, and refused to transport the same to the point stated; that the package was properly marked and branded, as the United States laws require, and was not refused because it was not so properly marked and branded, but solely because it contained intoxicating liquors.  Complainants further allege that such refusal on the part of said defendant to ship any intoxicating liquors into that part of Oklahoma formerly known as the Indian Territory is an undue prejudice and disadvantage to complainants in their business, and by such refusal they will sustain great loss, to remedy which they seek the relief prayed for.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

.There is a demurrer to the petition. An answer has also been filed, accompanied by a stipulation of facts, and the whole case submitted to the court upon its merits. There are no facts in the answer and none in the stipulation which, in the opinion of the court, are not raised also by the demurrer, and therefore they are omitted from the opinion.

Youmans & Youmans, for complainants.
C. E. & H. P. Warner, for defendant.

ROGERS, District Judge (after stating the facts as above). The first question which this demurrer raises is whether the tenth section of the act of March 2, 1889, supra, authorizes this proceeding. That depends upon the further question as to whether the petition brings the case stated within the purview of the provisions of the interstate commerce law. In the third section of an act to regulate commerce, approved February 4, 1887 (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]), it is provided:

"Sec. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

A critical examination of that section makes it clear that it is unlawful for any common carrier "to make or give any undue or unreasonable preference or advantage to * * * any particular description of traffic, in any respect whatsoever, or to subject any * * * particular description of traffic to undue or unreasonable prejudice or disadvantage in any respect whatsoever." The allegations of the complaint make it clear that the case made is completely covered by that statute; provided intoxicating liquor is an article of commerce and is not prohibited by law from being introduced into that part of the state of Oklahoma known as the Indian Territory. Whether intoxicating liquor is prohibited by law from being introduced into said territory depends upon the question as to whether or not the act of January 30, 1897 (Act Jan. 30, 1897, c. 109, 29 Stat. 506) is still in force as to that territory.

The purpose of this legislation is obvious. Speaking historically the status of the Indian and that of the Indian Territory were in a transition state. Congress was preparing the Indians for individual allotment, for American citizenship and statehood, and at the same time was endeavoring to guard the Indian from the evil consequences of intoxicating liquor and the sinister designs of unscrupulous people who might take advantage of their weakness for strong drink and despoil them of their properties. While this statute was in force, the act of Congress enabling Oklahoma to become a state was approved June 16, 1906 (Act June 16, 1906, c. 3335, 34 Stat. 267 [U. S. Comp. St. Supp. 1909, p. 155]). It is insisted that the second paragraph of section 3 of that act (34 Stat. 269, 270) repeals the intercourse act of January 30, 1897, supra, which forbade the introduction of intoxicating liquors into the Indian Territory. That section of the enabling act is as follows:

"Second. That the manufacture, sale, barter, giving away, or otherwise furnishing, except as hereinafter provided, of intoxicating liquors within those parts of said state now known as the Indian Territory and the Osage Indian reservation and within any other parts of said state which existed as Indian reservations on the first day of January, nineteen hundred and six, is prohibited for a period of twenty-one years from the date of the admission of said state into the Union, and thereafter until the people of said state shall otherwise provide by amendment of said constitution and proper state legislation. Any person individual or corporate, who shall manufacture, sell, barter, give away, or otherwise furnish any intoxicating liquor of any kind, including beer, ale, and wine, contrary to the provisions of this section, or who shall, within the above-described portions of said state, advertise for sale or solicit the purchase of any such liquors or who shall ship or in any way convey such liquors from other parts of said state into the portions hereinbefore described, shall be punished, on conviction thereof, by fine not less than fifty dollars and by imprisonment not less than thirty days for each offense: Provided, that the Legislature may provide by law for one agency under the supervision of said state in each incorporated town of not less than two thousand population in the portions of said state, hereinbefore described; and if there be no incorporated town of two thousand population in any county in said portions of said state, such county shall be entitled to have one such agency, for the sale of such liquors for medicinal purposes; and for the sale, for industrial purposes, of alcohol which shall have been denaturized by some process approved by the United States Commissioner of Internal Revenue; and for the sale of alcohol for scientific purposes to such scientific institutions, universities, and colleges as are authorized to procure the same free of tax under the laws of the United States; and for the sale of such liquors to any apothecary who shall have executed an approved bond, in a sum not less than one thousand dollars, conditioned that none of such liquors shall be used or disposed of for any purpose other than in the compounding of prescriptions or other medicines, the sale of which would not subject him to the payment of the special tax required of liquor dealers by the United States, and the payment of such special tax by any person within the parts of said state hereinabove defined shall constitute prima facie evidence of his intention to violate the provisions of this section. No sale shall be made except upon the sworn statement of the applicant in writing setting forth the purpose for which the liquor is used, and no sale shall be made for medicinal purposes except sales to apothecaries as hereinabove provided unless such statement shall be accompanied by a bona fide prescription signed by a regular practicing physician, which prescription shall not be filled more than once. Each sale shall be duly registered, and the register thereof, together with the affidavits and prescriptions pertaining thereto, shall be open to inspection by any officer or citizen of said state at all times during business hours. Any person who shall knowingly make a false affidavit for the purpose aforesaid shall be deemed guilty of perjury. Any physician who shall prescribe any such liquor, except for treatment of disease which after his own personal diagnosis he shall deem to require such treatment, shall, upon conviction thereof, be punished for each offense by fine of not less than two hundred dollars or by imprisonment for not less than thirty days, or by both such fine and imprisonment; and any person connected with any such agency who shall be convicted of making any sale or other disposition of liquor contrary to these provisions shall be punished by imprisonment for not less than one year and one day. Upon the admission of said state into the Union these provisions shall be immediately enforceable in the courts of said state."

In considering this question we are compelled to assume that the Congress understood not only the status of the Indian, but also what would be the effect of admitting Oklahoma into the Union as a sovereign state under the Constitution. The very title of the enabling act shows that Congress intended Oklahoma to "be admitted into the Union on equal footing with the original states"; but, if it had intended otherwise, the result would have been the same. Chief Justice

Taney, in the Dred Scott Decision, 19 How. 446, 15 L. Ed. 691, in discussing the duties and powers of the federal government in acquiring additional territory, and the admission of states into the Union, said:

"There is certainly no power given by the Constitution to the federal government to establish or maintain colonies bordering on the United States, or at a distance, to be ruled and governed at its own pleasure; nor to enlarge its territorial limits in any way, except by the admission of new states. That power is plainly given; and if a new state is admitted, it needs no further legislation by Congress, because the Constitution itself defines the relative rights and powers, and duties of the state, and the citizens of the state and the federal government. But no power is given to acquire a territory to be held and governed permanently in that character."

In Sands v. Manistee River Improvement Co., 123 U. S. 289, 8 Sup. Ct. 113, 31 L. Ed. 149, Mr. Justice Field, speaking for the full court, in discussing the respective powers of the state of Michigan and the federal government, as affected by the ordinance of 1787, said:

"There was no contract in the fourth article of the ordinance of 1787 respecting the freedom of the navigable waters of the territory northwest of the Ohio river emptying into the St. Lawrence, which bound the people of the territory, or of any portion of it, when subsequently formed into a state and admitted into the Union.

"The ordinance of 1787 was passed a year and some months before the Constitution of the United States went into operation. Its framers, and the Congress of the confederation which passed it, evidently considered that the principles and declaration of rights and privileges expressed in its articles would always be of binding obligation upon the people of the territory. The ordinance in terms ordains and declares that its articles 'shall be considered as articles of compact between the original states and the people and states in the said territory, and forever remain unalterable unless, by common consent.' And for many years after the adoption of the Constitution, its provisions were treated by various acts of Congress as in force, except as modified by such acts. In some of the acts organizing portions of the territory under separate territorial governments, it is declared that the rights and privileges granted by the ordinance are secured to the inhabitants of those territories. Yet from the very conditions on which the states formed out of that territory were admitted into the Union, the provisions of the ordinance became inoperative except as adopted by them. All the states thus formed were, in the language of the resolutions or acts of Congress, 'admitted into the Union on an equal footing with the original states in all respects whatever.' Michigan, on her admission, became, therefore, entitled to and possessed of all the rights of sovereignty and dominion which belonged to the original states, and could at any time afterwards exercise full control over its navigable waters except as restrained by the Constitution of the United States and laws of Congress passed in pursuance thereof. Permoli v. First Municipality of New Orleans, 3 How. 589, 600 [11 L. Ed. 739]; Pollard v. Hagan, 3 How. 212 [11 L. Ed. 565]; Escanaba Co. v. Chicago, 107 U. S. 678, 688 [2 Sup. Ct. 185, 27 L. Ed. 442]; Van Brocklin v. Tennessee, 117 U. S. 151, 159 [6 Sup. Ct. 670, 29 L. Ed. 845]; Huse v. Glover, 119 U. S. 543, 546 [7 Sup. Ct. 313, 30 L. Ed. 487]."

This principle was approved by Mr. Justice Bradley, speaking for the full court, in Williamette Iron Bridge Co. v. Hatch, 125 U. S. 9, 8 Sup. Ct. 815 (31 L. Ed. 629), where this language occurred:

"This court has held that, when any new state was admitted into the Union from the North West Territory, the ordinance in question ceased to have any operative force in limiting its powers of legislation as compared with those possessed by the original states. On the admission of any such

new state, it at once became entitled to and possessed all the rights of dominion and sovereignty which belonged to them. See the cases of Pollard's Lessee v. Hagan, supra; Permoli v. First Municipality, 3 How. 589 [11 L. Ed. 739]; Escanaba Co. v. Chicago; Cardwell v. American Bridge Co. [113 U. S. 205, 5 Sup. Ct. 423, 28 L. Ed. 959]; Huse v. Glover, qua supra."

In Bolln v. Nebraska, 176 U. S. 88, 20 Sup. Ct. 289 (44 L. Ed. 382), Mr. Justice Brown said:

"Upon the admission of a state it becomes entitled to and possesses all the rights of dominion and sovereignty which belonged to the original states, and, in the language of the act of 1867 admitting the state of Nebraska, it stands 'upon an equal footing with the original states in all respects whatsoever.' "

The same principle is approved in Ward v. Race Horse, 163 U. S. 511, 16 Sup. Ct. 1076, 41 L. Ed. 244, where Mr. Justice White, beginning with Pollard v. Hagan, 3 How. 212, 11 L. Ed. 565, reviews a number of cases and upheld the doctrine stated.

It must therefore be conceded that, when Oklahoma was admitted under the federal Constitution into the Union as a state, the act of admission gave to her all the powers and devolved upon her all the duties which belong to the other states under the Constitution, anything in the enabling act to the contrary notwithstanding. She could come into the Union in no other way. By virtue of the Constitution her admission fixed her status and that of her people, to the people of other states, to the other states themselves, and to the federal government. Congress cannot exact of a state—even a state coming into the Union—the surrender or waiver of any of the constitutionally inherent powers of sovereignty under the Constitution or such as belong to the original states; nor can a state either surrender or stipulate away any of its sovereignty or render herself less sovereign than the other states. Bearing these principles in mind, Congress knew that the moment Oklahoma was admitted into the Union as a state that the laws regulating interstate commerce must apply to Oklahoma as to all the other states; it knew that the power over intrastate commerce would inure to the state of Oklahoma by the act of admission; it knew that Oklahoma must enact its own laws regulating intrastate commerce, for the simple reason that the power to enact such laws had not been granted to Congress; it knew that the great body of laws traceable to the police power of the state must be enacted by the state for the same reason. Congress knew that intoxicating liquors were articles of commerce, so far as the interstate commerce law was concerned, and that no state could prohibit their introduction within its borders. Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128; Vance v. Vandercook, 170 U. S. 438, 18 Sup. Ct. 674, 42 L. Ed. 1100; Adams Express Co. v. Kentucky, 214 U. S. 218, 29 Sup. Ct. 633, 53 L. Ed. 972; Atlantic Coast Line v. Wharton, 207 U. S. 328, 28 Sup. Ct. 121, 52 L. Ed. 230; U. S. Rev. St. § 5258;[1] sections 238, 239, 240 of the act of March 4, 1909 (Act March 4, 1909, c. 321, 35 Stat. 1136, 1137 [U. S. Comp. St. Supp. 1909, p. 1464]), entitled "An act to codify, revise and amend the penal laws of the United States, wherein regulations for the shipment of intoxicating liquors from one state or territory to another state or territory are provided, and heavy penalties prescribed for violating the same."

[1] U. S. Comp. St. 1901, p. 3564.

Now, let us look a moment to that part of the enabling act quoted above. Its scrutiny discloses that it simply required that Oklahoma should make that part of the enabling act in relation to the manufacture and sale of intoxicating liquors a part of its Constitution. Indeed, the incorporation of that provision of the enabling act into the Constitution of Oklahoma was made a condition precedent to its admission into the Union. Oklahoma complied with it and was admitted. On its face Congress did not undertake to enforce the enabling act; it did not seek to force Oklahoma into the Union. The very last sentence of that part of the act quoted shows that Congress intended that Oklahoma should adopt and then enforce it. It says:

"Upon the admission of the state into the Union these provisions shall be immediately enforceable in the courts of the state."

What was the purport of the provisions which were to be enforceable by the state? They were not provisions forbidding the introduction of intoxicating liquors into the state of Oklahoma. Neither Oklahoma nor any other state has any power to regulate interstate commerce. That power has been confided by all the states to the Congress. It is a plenary power, and all the legislation that is valid relating to interstate commerce is traceable to that power. Congress could not delegate its exercise to a state. To do so would be a violation of its duty to every other state and an abdication of its constitutional functions to that extent. That Congress realized this is manifest from the very terms of the enabling act. The act dealt solely with the manufacture and disposal of intoxicating liquor within that part of Oklahoma known as the Indian Territory, and the shipment and conveyance of intoxicating liquors from other parts of the state of Oklahoma into the Indian Territory and into certain reservations within the state. These were provisions clearly within the police power of the state, and properly enforceable by the state, in the event Congress saw fit to withdraw its jurisdiction from over the Indians. Matter of Heff, 197 U. S. 508, 25 Sup. Ct. 512 (49 L. Ed. 848). The court says:

"But it is contended that, although the United States may not punish under the police power the sale of liquor within a state by one citizen to another, it has power to punish such sale if the purchaser is an Indian. And the power to do this is traced to that clause of section 8, art. 1, of the Constitution, which empowers Congress 'to regulate commerce with foreign nations, and among the several states, and with the Indian tribes.' It is said that commerce with the Indian tribes includes commerce with the members thereof, and Congress having power to regulate commerce between the white men and the Indians continues to retain that power, although it has provided that the Indian shall have the benefit of and be subject to the civil and criminal laws of the state and shall be a citizen of the United States, and therefore a citizen of the state. But the logic of his argument implies that the United States can never release itself from the obligation of guardianship; that so long as an individual is an Indian by descent, Congress, although it may have granted all the rights and privileges of national and therefore state citizenship, the benefits and burdens of the laws of the state, may at any time repudiate this action and reassume its guardianship, and prevent the Indian from enjoying the benefit of the laws of the state, and release him from obligations of obedience thereto. Can it be that because one has Indian, and only Indian, blood in his veins, he is to be forever one of a special class over whom the general government may in its discretion assume the rights of guardianship which it has once abandoned, and this whether the state or the

individual himself consents? We think the reach to which this argument goes demonstrates that it is unsound." ·

But the act went further: It provided for the sales of intoxicating liquor under certain stringent restrictions in certain towns in the Indian Territory of 2,000 population, and, if there were no such towns in any county, then for one place for the sale of intoxicants in each of such counties, and also for certain other sales not necessary to mention, but which appear in that act. Those parts of the enabling act to which I have just referred do not purport to be enforceable by the federal government, nor were they to be enforceable by Oklahoma until it became a state. If Oklahoma had declined to accept the terms of the enabling act and to become a state of the Union, the provisions referred to would not have been enforceable at all. The logic of the argument to the effect that the enabling act repealed the intercourse act of January 30, 1897, leads to the conclusion that the enabling act, having repealed the intercourse act, left the Indian Territory, from the date of the act until Oklahoma was admitted as a state, without any protection whatever from the introduction of liquor into it. Such a result could not have been in the contemplation of Congress, or it never would have provided the protection for the Indian contained in the enabling act itself.

In Pickett v. United States, 216 U. S. 460, 30 Sup. Ct. 267, 54 L. Ed. ——, the Supreme Court of the United States said with reference to the construction of a statute that:

"No construction should be adopted, if another equally admissible can be given, which would result in what might be called a judicial chasm."

Moreover, it is clear that the intercourse act was not repealed, as applied to all tribes of Indians. It was so held in U. S. v. Sutton, 215 U. S. 291, 30 Sup. Ct. 116, 54 L. Ed. ——. But if not repealed by the enabling act, was it repealed otherwise, as to the Indian Territory, by reason of the course of legislation and the admission of the state of Oklahoma into the Union? The investigation of this subject has brought under review the most voluminous and incongruous mass of legislation I remember to have encountered in any one case, not to mention decisions of the courts not altogether harmonious. Draper v. U. S., 164 U. S. 244, 17 Sup. Ct. 107, 41 L. Ed. 419. Because of the importance of the question I have spared no labor to try to reach a sound conclusion. In stating it, no effort will be indulged to review either the decisions or the legislation. A brief historical reference should be made to the political, social, and legal status of the Indians in the Indian Territory, and of the Indian Territory itself. When Oklahoma was admitted as a state in the Union, the whole of Oklahoma Territory, including the Indian Territory, had been surveyed, and allotments had been made except as to certain lands containing minerals and certain forest reservations, which were still held in trust by the United States for the Indian. Individual patents had been issued, or were in process of issuance, to the allottees; their tribal governments had been abolished; many thousands of United States citizens, including foreigners pursuing all the lawful avocations of life, resided there; and towns and cities, with municipal govern-

ments, and general laws, and courts, were in full operation. By the enabling act United States courts· were created, and it was provided that:

"The Circuit and District Courts for each of said districts, and the judges thereof, respectively, shall possess the same powers and jurisdiction and perform the same duties required to be performed by the other circuit and ditrict courts and judges of the United States, and shall be governed by the same laws and regulations."

It was also provided that the laws of the territory of Oklahoma, so far as applicable, "shall extend over and apply to said state until changed by the Legislature." ·True, the United States imposed certain restrictions as to certain classes of Indians upon the alienation of their lands, and reserved the power to enforce these, and to enact other legislation for the protection of the Indians and their property. They were all citizens of the United States, and citizens of the state of Oklahoma. The United States reserved no power, in express terms, of sole and exclusive jurisdiction over the Indian Territory or the Indians; on the contrary, all the citizens of Oklahoma were made subject to the jurisdiction of the state of Oklahoma, except as to certain reserved powers mentioned in the act, and which in no sense invaded or attempted to invade the police powers of the state. The nature of these reserved powers will be better understood by an examination of the case of United States v. J. P. Allen et al., and 16 other cases disposed of in one opinion by the Eighth Circuit Court of Appeals at the May term, 1910 (179 Fed. 13). The question in those cases was whether the United States could maintain in its own name suits to enforce restrictions upon the alienation by the Indians of their lands, made in violation of .certain statutes and treaty stipulations. The case arose in Oklahoma. Among other things the court said:

"Much of the briefs is devoted to arguments deduced solely from the fact that Congress has conferred national citizenship upon the Indians. These arguments have ·been frequently presented to the courts; but, so far as we are aware, they have never defeated the exercise of national authority over the Indian except in the Heff Case, 197 U. S. 488 [25 Sup. Ct. 506, 49 L. Ed. ·848]. That decision, however, as now explained by the Supreme Court in United States v. Celestine, 215 U. S. 278 [30 Sup. Ct. 93, 54 L. Ed. ——], lends no support to the defendants. The case arose under the general allotment act of 1887. That statute provides that upon the completion of the allotments, the Indians 'shall have the benefit of, and be subject to, the laws, both civil and criminal, of the state.' Mr. Justice Brewer carries this feature of the statute through his opinion at every step as the basis of the decision of the court. He has now removed all possible doubt on the subject by his opinion in the Celestine Case, where he expressly states that the Heff opinion rests upon the fact that. under the general allotment act Congress has, by direct provision, entirely renounced its own authority over the Indians, and subjected them to the laws of the state, both civil and criminal. The decision of the Heff Case simply gives effect to this positive declaration of the legislative intent. In its dealings with the five civilized nations, Congress has ·been at great pains to indicate a different purpose. Here it has from time to time down to the organic act admitting Oklahoma, and the provisions which it insisted should be embodied in the Constitution of that state, reserved to itself express authority to pass such laws with respect both to the Indians and their lands, as shall in its judgment seem wise. In the present case, though it conferred citizenship upon the Indians, it accompanied its grant of the allotments to them with an express provision against their alienation. The difference between the present case and the Heff Case is this: In the former case Congress

expressly renounced its own authority over the Indians, and subjected them to the laws, both civil and criminal, of the state. Here Congress, with equal explicitness, has imposed a restraint upon the alienation of allotments. It is as much the duty of the courts to give effect to the legislative intent in the present case as in the former. See, also, U. S. v. Sutton, 215 U. S. 291 [30 Sup. Ct. 116, 54 L. Ed. ——]."

The Heff Case, referred to in that opinion, arose in the state of Kansas. Heff was indicted under the act of January 30, 1897, now under consideration, in the United States District Court in Kansas for selling one Butler, a Kickapoo Indian, two quarts of beer. Butler belonged to the Kickapoo Tribe of Indians, was under the charge of an Indian superintendent, and had taken his allotment, and was a citizen of Kansas and of the United States; the Kickapoo reservation being within the state of Kansas. The late Mr. Justice Brewer, in discussing that case, said:

"In this republic there is a dual system of government, national and state. Each within its own domain is supreme, and one of the chief functions of this court is to preserve the balance between them, protecting each in the powers it possesses and preventing any trespass thereon by the other. The general police power is reserved to the states, subject, however, to the limitation that in its exercise the state may not trespass upon the rights and powers vested in the general government. The regulation of the sale of intoxicating liquors is one of the most common and significant exercises of the police power. And so far as it is an exercise of the police power it is within the domain of state jurisdiction."

Later, after discussing different phases of the case, he concludes by saying:

"We are of the opinion that when the United States grants the privileges of citizenship to an Indian, gives to him the benefit of and requires him to be subject to the laws, both civil and criminal, of the state, it places him outside the reach of police regulations on the part of Congress; that the emancipation from federal control thus created cannot be set aside at the instance of the government without the consent of the individual Indian and the state; and that this emancipation from federal control is not affected by the fact that the lands it has granted to the Indian are granted subject to a condition against alienation and incumbrance, or the further fact that it guarantees to him an interest in tribal or other property.

"The District Court of Kansas did not have jurisdiction of the offense charged, and therefore the petitioner is entitled to his discharge from imprisonment."

The Heff Case does not offend against the Allen Case, supra. But it was a case of selling, not introducing. The Sutton Case, supra, was an indictment for introducing upon a certain Indian allotment within the limits of the Yakima Indian reservation in the state of Washington. The case was tried in the District Court of the United States for the Eastern District of that state, and was also brought under the act of January 30, 1897. A demurrer was interposed to the indictment, and sustained for want of jurisdiction in the District Court. On writ of error the Supreme Court said:

"In this offense neither race or color are significant. The Indians, as wards of the government, are the beneficiaries; but for their protection the prohibition is against all, white man and Indian alike. Legislation of this nature has been for a long time in force. Section 4, c. 174, Act July 9, 1832, 4 Stat. 564; section 2139, Rev. St. If the Yakima reservation were within the limits of a territory, there would be no question of the validity of the statute

under which this indictment was found; but the contention is that the offense, charged is of a police nature, and that the full police power is lodged in the state, and by it alone can such offenses be punished. By the second paragraph of section 4 of the enabling act with respect to the state of Washington (chapter 180, 25 St. 677), the people of that state disclaimed all right and title 'to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States.' Construing this, in connection with other provisions of the enabling act, it was held in Draper v. United States, 164 U. S. 240 [17 Sup. Ct. 107, 41 L. Ed. 419], that it did not deprive the state of jurisdiction over crimes committed within a reservation by others than Indians or against Indians, following in this United States v. McBratney, 104 U. S. 621 [26 L. Ed. 869]. But in terms 'jurisdiction and control' over Indian lands remain in the United States, and, there being nothing in the section withdrawing any other jurisdiction than that named in Draper v. United States, undoubtedly Congress has the right to forbid the introduction of liquor and to provide punishment for any violation thereof. Couture, Jr., v. United States, 207 U. S. 581 [28 Sup. Ct. 259, 52 L. Ed. 350]. It is true that only a per curiam opinion was filed in that case, and the judgment was affirmed on the authority of United States v. Rickert, 188 U. S. 432 [23 Sup. Ct. 478, 47 L. Ed. 532]; McKay v. Kalyton, 204 U. S. 458 [27 Sup. Ct. 346, 51 L. Ed. 566]. But an examination of the record shows that its facts are similar to those in the present case. See, also, an opinion by Shiras, District Judge, in United States v. Mullin [D. C.] 71 Fed. 682, and one by Circuit Judge Van Devanter, speaking for the Circuit Court of Appeals for the Eighth Circuit, in Rainbow v. Young, 161 Fed. 835 [88 C. C. A. 653].

"Without pursuing the discussion further, we are of opinion that the District Court erred in its ruling, and the judgment is reversed."

· It will be seen that this case turned upon the provision of the enabling act with respect to the state of Washington whereby absolute jurisdiction and control of the courts of the United States was in terms expressly reserved over the Indian land until the title thereto was extinguished. Paragraph 3, § 3 of the Oklahoma enabling act (34 Stat. 270) was evidently in part copied from that, or some similar, enabling act, but is marked by a distinct difference. It disclaims all interest in both the public and Indian lands in Oklahoma, and then in terms expressly reserves jurisdiction, disposal, and control over, not the "Indian lands," but the "public lands," until the title of the United States is extinguished, while in the Washington enabling act (25 Stat. 677) "absolute jurisdiction and control" is reserved over the "Indian lands." Therein lies the difference in the two acts. True, in the first section of the Oklahoma enabling act the right is reserved by the United States to make laws and regulations respecting the Indians, their lands, property, or other rights, etc.; but this provision relates to future legislation, and not to legislation then in force. Moreover, it will be observed that the title of the United States to the lands in the Indian country, except the reservations referred to, has long since been extinguished, and with the exception of lands of certain classes of Indians is made alienable at the pleasure of the allottee, or patentee, among whom are thousands of white people and negroes, and all citizens of the United States, and jurisdiction is expressly conferred in the enabling act upon the state of Oklahoma over the manufacture and traffic in intoxicating liquors in the state of Oklahoma, including the Indian Territory under certain restrictions enforceable by the state.

Is it reasonable to suppose that, if Congress intended to reserve the power to prevent the introduction of intoxicating drinks into the Indian Territory, the state of Oklahoma would have been admitted with the power to introduce, manufacture, and sell liquors in other parts of the state of Oklahoma than the Indian Territory and the Indian reservations referred to in that enabling act, and to control the introduction of intoxicants from other parts of Oklahoma into the Indian Territory? The logic of an affirmative answer to this question may be illustrated in this way: The Indian Territory is bounded by Oklahoma, Texas, Arkansas, and Missouri. Undoubtedly Congress had, by its power to regulate intercourse with the Indian tribes, under repeated decisions, to control absolutely the introduction of intoxicants into the Indian Territory, from the adjoining states and from other parts of Oklahoma as well (U. S. v. Sutton, 215 U. S. 296, 30 Sup. Ct. 116, 54 L. Ed. ——; Matter of Heff, supra; U. S. v. Holliday, 3 Wall. 407, 18 L. Ed. 182); but by the Oklahoma enabling act the state of Oklahoma is left with jurisdiction over the introduction of intoxicants from Oklahoma into the Indian Territory through its own courts as well as the sales and disposals of intoxicants therein; but, if the act of January 30, 1897, is in force in the Indian Territory, the United States District Court for the Eastern District of Oklahoma has exclusive cognizance of the introduction of intoxicants from the other named states. This is an anomaly in legislation, and it occurs to me approaches the reductio ad absurdum. We should have two courts, foreign to each other, created by separate and distinct sovereignties, exercising cognizance over exactly the same offenses, each in the same place and at the same time, and the jurisdiction of the court made to depend on the state from which the liquor was introduced. In the Heff Case, supra, Mr. Justice Brewer said:

"There is in these police matters no such thing as a divided sovereignty. Jurisdiction is vested in either the state or the nation and not divided between the two."

For the reason stated I do not think the Sutton Case applicable to the facts of this case, and hence not controlling. In U. S. v. McBratney, 104 U. S. 623, 26 L. Ed. 869, approved in the case of Draper v. U. S., 164 U. S., at page 243, 17 Sup. Ct., at page 108 (41 L. Ed. 419), where the Supreme Court said:

"The act of March 3, 1875, c. 139 (the enabling act which provided for the admission of the state of Colorado), necessarily repeals the provisions of any prior statute, or of any existing treaty, which are clearly inconsistent therewith. The Cherokee Tobacco, 11 Wall. 616 [20 L. Ed. 227]. Whenever, upon the admission of a state into the Union, Congress has intended to except out of it an Indian reservation, or the sole and exclusive jurisdiction over that reservation, it has done so by express words. The Kansas Indians, 5 Wall. 737 [18 L. Ed. 667]; United States v. Ward, Woolw. 17 [Fed. Cas. No. 16,639]. The state of Colorado, by its admission into the Union by Congress, upon an equal footing with the original states in all respects whatever, without any such exception as had been made in the treaty with the Ute Indians and in the act establishing a territorial government, has acquired criminal jurisdiction over its own citizens and other white persons throughout the whole of the territory within its limits, including the Ute reservation, and that reservation is no longer within the sole and exclusive jurisdiction of the United States. The courts of the United States have, therefore, no juris-

diction to punish crimes within that reservation, unless so far as may be necessary to carry out such provisions of the treaty with the Ute Indians as remain in force. But that treaty contains no stipulation for the punishment of offenses committed by white men against white men."

The precise question now under consideration is more nearly presented in the case of United States v. Hall (D. C.) 171 Fed. 214. The facts in that case are very similar to those in the case at bar. The question was raised differently, but in effect is the same. The opinion is marked by careful research, reviewing the decisions applicable, down to and including the Heff Case, supra. It is clear and strong in its reasoning, and I think controls this case. Hall was an Oneida Indian, the members of which tribe had become allottees, holding trust patents. A large part of the Oneida reservation was held by white men who had obtained titles from the heirs at law of deceased allottees under existing laws. The Oneida reservation had been organized and divided into two townships, and was situate in Wisconsin, with provisions for local government. Under these conditions Hall was indicted in the United States District Court for the Eastern District of Wisconsin, under the act of January 30, 1897, for introducing liquor into the Oneida reservation. The principle of law in the case at bar would not be different if a Choctaw Indian were indicted in the United States District Court for the Eastern District of Oklahoma for introducing intoxicating liquors from Arkansas into the Indian Territory, for if the act of January 30, 1897, is in force as applicable to the Indian Territory, the District Court for the Eastern District of Oklahoma would, in that event, have jurisdiction, and if the same act is in force no mandamus could go in this case. Manifestly no mandamus could go from this court to compel the doing of an act which, when done, is indictable under the laws of the United States in the Eastern District of Oklahoma. The Hall Case must be read to get the full force of it. A demurrer was sustained to the indictment in that case for want of jurisdiction.

The substantial facts in the Hall Case are strikingly similar to those in the case at bar, and it seems to me it is conclusive of this case. It is to be hoped this case will be carried to the appellate court, and a controlling decision had. If the decision is sound, the common carriers should not be harrassed by vexatious litigation so long as their shipments remain interstate commerce, nor should carriers be subjected to indictment in the United States courts for discharging their duties under the interstate commerce laws. On the other hand, if the decision is erroneous, the Indians are entitled to the protection contemplated by the act of January 30, 1897, and that statute should be enforced by the United States courts. As throwing light upon this subject, see Crescent Liquor Company v. Platt (C. C.) 148 Fed. 894.

The demurrer is overruled.

Let the writ of mandamus go.