UNITED STATES EXPRESS CO. v. FRIEDMAN et al.

(Circuit Court of Appeals, Eighth Circuit. November 24, 1911.)

No. 3,511.

1. INDIANS (§ 35*)—INTRODUCTION OF LIQUOR INTO INDIAN TERRITORY—INDIAN COUNTRY—EFFECT OF ADMISSION OF OKLAHOMA.

That portion of Oklahoma formerly the Indian Territory did not cease to be Indian country on the admission of the state, nor did such admission affect the application to that part of the state of Rev. St. § 2139, or of Act Jan. 30, 1897, c. 109, 29 Stat. 506, relating to the sale of liquor to Indians and its introduction into the Indian country.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 35.*]

2. INDIANS (§ 35*)—LAWS RELATING TO INTOXICATING LIQUORS—APPLICATION.

The power of Congress over Indian relations is plenary, and it may prohibit and provide for the punishment of acts relating to and affecting Indians anywhere in the United States, and the location of a given territory within or without a state has nothing to do with whether it is or is not Indian country or with the application of the laws prohibiting the sale or introduction of liquor therein.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 35.*]

3. INDIANS (§ 35*)—INTRODUCTION OF LIQUOR INTO INDIAN TERRITORY—EFFECT OF OKLAHOMA ENABLING ACT.

The provision of Oklahoma Enabling Act June 16, 1906, c. 3335, § 3, 34 Stat. 269, that the state Constitution shall prohibit the manufacture or sale of intoxicating liquor in the parts of the state known as the Indian Territory and Osage Indian reservation and within any parts of the state which existed as Indian reservations on January 1, 1906, for a period of 21 years from the date of admission, was in compliance with the agreements with the Seminole and Creek Tribes, ratified July 1, 1898, and March 1, 1901, respectively (Act July 1, 1898, c. 542, 30 Stat. 567, and Act March 1, 1901, c. 676, 31 Stat. 861), by which the United States agreed to maintain strict laws in their countries against the introduction or sale of intoxicating liquors therein, and, even conceding that its effect was to turn over to the state the suppression of the liquor traffic between other points in Oklahoma and the Indian Territory, was not an abandonment of the power which Congress alone could exercise to suppress such traffic between other states and such territory, nor did it operate to repeal by implication Act Jan. 30, 1897, c. 109, 29 Stat. 506, making it a crime to introduce liquor into the Indian country as applied to such territory.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 35.*]

In Error to the District Court of the United States for the Western District of Arkansas.

Action for mandamus on relation of Lewis Friedman and Hiram Mincer, partners as Friedman & Co., against the United States Express Company. Judgment (180 Fed. 1006) granting the writ, and defendant brings error. Reversed.

J. R. Cottingham, S. T. Bledsoe, and F. H. Platt, for plaintiff in error.

F. A. Youmans, for defendants in error.

Before ADAMS and SMITH, Circuit Judges, and REED, District Judge.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
191 F.—43

SMITH, Circuit Judge. This is an action of mandamus. The relators, Lewis Friedman and Hiram Mincer, partners as Friedman & Co., are in business as dealers in intoxicating liquors at Ft. Smith, Ark. For convenience that part of Oklahoma formerly known as Indian Territory will be called by the latter name to distinguish it from the balance of that state. The United States Express Company is doing a regular express business from Ft. Smith, Ark., to points in Indian Territory over·the lines of the St. Louis & San Francisco Railroad and the Chicago, Rock Island & Pacific Railroad. Relators' business consists in part of the sale of intoxicating liquors in the state of Arkansas upon orders received by mail from points in the Indian Territory and the shipment of liquors under such orders to persons at points in the Indian Territory. The United States Express Company has refused generally to accept such shipments and particularly refused to accept a shipment to one J. W. Clifford, at Manford, Ind. T. There is nothing· to show whether Clifford is a white man or an Indian, and if the latter, nothing to show his personal status, or 'whether, if an allottee, his restrictions have been removed. The prayer is,. not that the Express Company be required to accept the shipment to Clifford, but for a writ of mandamus commanding the Express Company to·accept from relators at Ft. Smith, Ark., intoxicating liquors for shipment from that point to any point within that portion of the state of Oklahoma formerly called the Indian Territory and for such other process, order, or judgment as may be proper. The District Court rendered judgment (180 Fed. 1006) as prayed by the relators, and the Express Company has brought the case here on writ of error. The action is sought to be maintained under section 10 of the Act of Congress approved March 2, 1889, 25 Stat. 862 (U. S. Comp. St. 1901, p. 3172).

The national power over the subject of the suppression of the liquor traffic with the Indians is derived. from various sources: First, the treaty-making power. Second, the power to regulate interstate commerce. Third, the power to regulate commerce with the Indian tribes. Fourth, the ownership, as sovereign, of lands to which the Indian title has not been extinguished. Fifth, the plenary authority arising out of its guardianship of the Indians as an alien but dependent people.

The power of Congress to deal with the Indians is in general political in its character and not subject for that reason to be controlled by the Judicial Department. Lone Wolf v. Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299. Much as our policy with the Indians has varied on other subjects to avoid the danger to Indians and whites alike from permitting the use of liquor by the Indians, a fixed and unchanging policy has been pursued. There has never been the slightest effort to surround the traffic with regulations, but its absolute suppression has been the constant aim of Congress for more than 100 years. An act to regulate trade and intercourse with the Indian tribes and to preserve peace on the frontiers, approved March 30, 1802, 2 Stat. 146, § 21, authorized the President to take such measures from time to time as to him might appear expedient to prevent or restrain

the vending or distribution of spirituous liquors among all or any of the Indian tribes. Prior to this Congress had passed several temporary laws with reference to trade with the Indians; but this was the first permanent law enacted on the subject. By the Act of March 3, 1815, 3 Stat. 243, § 20, Congress prohibited all stills in the Indian country under a forfeiture of $5,000 and of all spirits there distilled and of all utensils employed therein. By the Act of May 6, 1822, 3 Stat. 682, § 2, the President was authorized to direct Indian agents, Governors of territories acting as superintendents of Indian affairs, and military officers, to cause the stores and packages of goods of all traders to be searched, upon suspicion or information that ardent spirits are carried into the Indian countries by said traders in violation of said twenty-first section of the Act of March 30, 1802, and it was declared that if any ardent spirits were so found all the goods of said traders should be forfeited. The Act of July 9, 1832, 4 Stat. 564, § 4, declared "that no ardent spirits shall be hereafter introduced, under any pretense, into the Indian country." The Act of June 30, 1834, 4 Stat. 732, § 20, imposed a forfeiture of $500 upon any person who should sell, exchange, give, barter, or dispose of any spirituous liquors or wine to an Indian in the Indian country, a forfeiture of $300 upon any one introducing or attempting to introduce any spirituous liquors or wine into the Indian country, and provided that if any superintendent of Indian affairs, Indian agent or subagent, or commanding officer of a military post, was informed or had reason to suspect that any white person or Indian had introduced or was about to introduce any spirituous liquors or wine into the Indian country, it should be lawful, under regulations of the President, to cause to be searched the boats, stores, packages, and places of deposit of such person, and if any such liquors or wine were found, provided for the forfeiture of the goods, boats, packages, and peltries of such person and for the revocation of the license of any such person if a licensed trader and that his bond be put in suit. It further provided that any person in the service of the United States or any Indian might lawfully destroy any ardent spirits or wine found in the Indian country except military supplies. Section 21 of this act imposed a penalty of $1,000 on any one who set up or continued any distillery in the Indian country and made it the duty of the superintendent of Indian affairs, Indian agents and subagents, to destroy and break up such distilleries and to use the military for that purpose. By the Act of March 3, 1847, 9 Stat. 203, § 2, an additional punishment of not exceeding two years imprisonment was imposed upon the sale, exchange, barter, giving, or disposing of spirituous liquors or wine to an Indian in the Indian country and an additional punishment of one year's imprisonment upon any one who should introduce or attempt to introduce spirituous liquor or wine into the Indian country. This same act provided (section 3) that no annuity of money or goods should be paid or distributed to Indians while under the influence of any description of intoxicating liquor, nor while there was good and sufficient reason for the officers or agents in charge to believe that there was any species of intoxicating liquors within convenient reach

of the Indians, nor until the chiefs and head men had pledged themselves to use all their influence and make all proper efforts to prevent the introduction and sale of spirituous liquors in their country. This provision was incorporated in section 2087 of the Revised Statutes.

In the Act of February 13, 1862, 12 Stat. 338, enacted as a substitute for section 20 of the Act of June 30, 1834, the chief change wrought was that while the old law provided for the punishment of any person who should sell, exchange, give, barter, or dispose of liquors to an Indian in the Indian country, the new law imposed a like punishment upon any one who should sell, exchange, barter, or dispose of any spirituous liquors or wine to any Indian under the charge of any Indian superintendent or Indian agent appointed by the United States whether such sale was made in the Indian country or not. A new substitute for this section was contained in the Act of March 15, 1864, 13 Stat. 29. The principal changes made were to confer jurisdiction of offenses upon the Circuit as well as the District Court, and to declare it the duty of any person in the service of the United States or of any Indian to destroy any ardent spirits found in the Indian country instead of simply making it lawful for him to do so. The provisions prohibiting the introduction of ardent spirits into the Indian country and prohibiting selling, exchanging, giving, bartering, and disposing of spirituous liquors and wine to an Indian under charge of a superintendent or agent were carried into section 2139 of the Revised Statutes; but by it sales by one Indian to another were excepted. Those provisions with reference to searches and forfeiture of goods, revocation of traders' licenses, suits on bonds, and the destruction of liquors by government employés and Indians, were all covered into section 2140 of the Revised Statutes. The provisions against distilleries in the Indian country were carried into sections 2141 and 2150 of the Revised Statutes. February 27, 1877 (19 Stat. 244), Congress amended section 2139 of the Revised Statutes by striking therefrom the words "except an Indian in the Indian country." The Indian appropriation act of July 4, 1884, 23 Stat. 94, contained this provision:

"And no part of section twenty-one hundred and thirty-nine or of section twenty-one hundred and forty of the Revised Statutes shall be a bar to the prosecution of any officer, soldier, sutler or storekeeper, attaché, or employé of the army of the United States who shall barter, donate, or furnish in any manner whatsoever liquors, wines, beer or any intoxicating beverage whatsoever to any Indian."

July 23, 1892 (27 Stat. 260), Congress enacted a substitute for section 2139, Revised Statutes, by which the provision against introducing ardent spirits into the Indian country was extended to ale, beer, wine, and all intoxicating liquor of whatever kind, and the like enlargement was made in the scope of the law prohibiting selling, exchanging, giving, bartering, and disposing of liquor to Indians. January 30, 1897, it being doubtful whether lands allotted to Indians remained Indian country under then existing laws, Congress enacted 29 Stat. 506:

"That any person who shall sell, give away, dispose of, exchange, or barter, any malt, spirituous or vinous liquor, including beer, ale, and wine, or any

ardent, or other intoxicating liquor of any kind whatsoever, or any essence, extract, bitters, preparation, compound, composition, or any article whatsoever, under any name, label, or brand, which produces intoxication, to any Indian to whom allotment of land has been made while the title to the same shall be held in trust by the government, or to any Indian a ward of the government under charge of any Indian superintendent or agent, or any Indian, including mixed bloods, over whom the government, through its departments, exercises guardianship, and any person who shall introduce or attempt to introduce any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or intoxicating liquor of any kind whatsoever into the Indian country, which term shall include any Indian allotment while the title to the same shall be held in trust by the government, or while the same shall remain inalienable by the allottee without the consent of the United States, shall be punished by imprisonment for not less than sixty days, and by a fine of not less than one hundred dollars for the first offense and not less than two hundred dollars for each offense thereafter: Provided, however, that the person convicted shall be committed until fine and costs are paid. * * *

"Sec. 2. That so much of the act of the twenty-third day of July, eighteen hundred and ninety-two, as is inconsistent with the provisions of this act is hereby repealed."

This law wrought several changes. It extended the prohibition to all mild spirituous and vinous liquors including beer, ale, and wine, and any ardent or other intoxicating liquor of any kind whatsoever, and any essence, extract, bitters, preparation, compound, composition, or any article whatsoever under any name, label, or brand, which produces intoxication. It specifically declared that the term "Indian country" should include any Indian allotment while the title to the same was held in trust by the government or while the same remained inalienable without the consent of the United States. It established a minimum limit of sentence and removed the maximum. It will be noticed that the only repealing clause in this act was of so much of the Act of July 23, 1892, as was inconsistent with the new law.

The so-called Five Civilized Tribes of the Indian Territory are the Choctaw, Chickasaw, Creek, Cherokee, and Seminole. December 16, 1897, the United States Commission to the Five Civilized Tribes, commonly known as the "Dawes Commission," made an agreement with the Seminole Tribe, having for its purpose the allotment of the Seminole lands and the ultimate dissolution of the tribal government, which contained this provision:

"The United States agrees to maintain strict laws in the Seminole country against the introduction, sale, barter or giving away of intoxicants of any kind or quality."

July 1, 1898, this agreement was ratified and confirmed by Act of Congress, 30 Stat. 567. March 8, 1900, the Dawes Commission made a similar but more elaborate agreement with the Creek Tribe, which contained this provision:

"43. The United States agrees to maintain strict laws in said nation against the introduction, sale, barter or giving away, of liquors or intoxicants of any kind whatsoever."

This agreement was ratified and confirmed by Act of Congress, March 1, 1901, 31 Stat. 861. Both of these agreements were made in express contemplation of allotment and tribal dissolution. The

various laws on the subject prior to the Oklahoma enabling act have been reviewed to show that under all the changes of policy with reference to the Indians for more than a century there has been but one sentiment as to the debauching effect of intoxicating liquors upon this primitive people, and but one purpose on the part of Congress, and that has been to absolutely suppress the traffic with them and shield them from its debasing influences. Every change in law has been to broaden and strengthen it to avoid evasions and to impose more severe punishment for its violation, and finally Congress pledged the solemn faith of the nation to the Seminole and Creek Tribes that it would in the future prevent the introduction of intoxicating liquors among them.

In United States v. Forty-Three Gallons of Whisky, 93 U. S. 188, 23 L. Ed. 846, it appears that by a treaty of October 2, 1863, 13 Stat. 667, bands of the Chippewa Indians ceded to the United States part of their reservation. The treaty provided:

"Art. 7. The laws of the United States now in force or that may hereafter be enacted prohibiting the introduction and sale of spirituous liquors in the Indian country shall be in full force and effect throughout the country hereby ceded until otherwise directed by Congress or the President of the United States."

After the lapse of eight years, when the ceded country had become settled by the white race and part of it an organized county in Minnesota, it was held that the Act of March 15, 1864, prohibiting the introduction of liquor into the Indian country, was in force in such ceded territory. The court said:

"It would be strange indeed if the commercial power lodged solely with Congress and unrestricted as it is by state lines did not extend to the exclusion of spirituous liquors intended to corrupt the Indians not only from existing Indian country, but from that which has ceased to be so by reason of its cession to the United States. The power to define originally the Indian country within which the unlicensed introduction and sale of liquors were prohibited necessarily includes that of enlarging the prohibited boundaries whenever in the opinion of Congress the interests of Indian intercourse and trade will be best subserved."

This case was again before the Supreme Court in 108 U. S. 491, 2 Sup. Ct. 906, 27 L. Ed. 803, and, interpreting the former opinion, the court said:

"Congress under its constitutional power to regulate commerce with the Indian tribes may not only prohibit the introduction and sale of spirituous liquors in the Indian country, but extend such prohibition to territory in proximity to that occupied by Indians."

It is contended by relators: First, that the portion of Oklahoma formerly called the Indian Territory ceased to be Indian country upon the admission of Oklahoma as a state, and that therefore section 2139 is no longer applicable to that portion of Oklahoma; second, the acceptance of the terms of the enabling act which authorized the formation of the Constitution and her admission as a state operated as a repeal of that section so far as the Indian Territory was concerned.

[1] Neither of these positions is sound. The enabling act for the admission of Oklahoma (34 Stat. 267) contained the following provisions:

"Nothing contained in the said Constitution shall be construed to limit or impair the rights of person or property pertaining to the Indians of said territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this act had never been passed. Said convention shall provide in said Constitution: * * * (2) That the manufacture, sale, barter, giving away or otherwise furnishing, except as hereinafter provided, of intoxicating liquors within those parts of said state now known as the Indian Territory and the Osage Indian reservation and within any other parts of said state which existed as Indian reservations on the first day of January, 1906, is prohibited for a period of twenty-one years from the date of the admission of said state into the Union and thereafter until the people of said state shall otherwise provide by amendment of said Constitution and proper state legislation. Any person, individual or corporate, who shall manufacture, sell, barter, give away or otherwise furnish any intoxicating liquor of any kind, including beer, ale and wine, contrary to the provisions of this section, or who shall within the above-described portions of said state advertise for sale or solicit the purchase of any such liquors or who shall ship or in any way convey such liquors from other parts of said state into the portions hereinbefore described shall be punished on conviction thereof by fine not less than fifty dollars and by imprisonment not less than thirty days for each offense. * * * Upon the admission of said state into the Union these provisions shall be immediately enforceable in the courts of said state. * * *

"Sec. 22. That the constitutional convention provided for herein shall, by ordinance irrevocable, accept the terms and conditions of this act."

The court has the right to take judicial notice not only of the legislation of Congress on this subject, but of all conditions in the Indian Territory which are matters of general and public notoriety. By a joint resolution of Congress of March 2, 1906, 34 Stat. 822, and by the Act of April 26, 1906, 34 Stat. 148, § 28, the tribal existence and governments of the Choctaw, Chickasaw, Cherokee, Creek, and Seminole Tribes or Nations were continued in full force and effect until otherwise provided by law. Under these laws the tribes and tribal governments still exist. Eighteen government Indian agents are still maintained in the Indian Territory exclusive of a large force of clerks. The Office of Indian Affairs reports that on November 1, 1911, there were then on hand unallotted and undisposed of 2,977,416 acres of Indian lands in Indian Territory belonging to the Five Civilized Tribes, of which 1,154,072 acres would be offered for sale in November and December, 1911. There is no law authorizing the sale of 450,000 acres and the balance of 1,373,344 acres has been temporarily withdrawn from sale. At the time of the decision of this case below and its submission in this court, these tribes of Indians in their tribal capacity owned about 3,000,000 acres or more of land. It would indeed be difficult to show how this land ceased to be Indian country.

[2] It will be conceded that the states are equal in power, and a new state, when admitted, is clothed with all the powers of the original states (Coyle v. Oklahoma, 221 U. S. 559, 31 Sup. Ct. 688, 55

L. Ed. 853); but the power of Congress over Indian relations is plenary and has no relation to state lines and Congress can in the exercise of that power protect the Indians from the debasing influence of intoxicating liquors in a state whether on or off a reservation (United States v. Holliday, 70 U. S. 407, 18 L. Ed. 182).

The United States has jurisdiction over the Indian tribes, and Congress may prohibit and provide for the punishment of acts relating to and affecting such Indians anywhere in the United States. United States v. Barnhart (C. C.) 22 Fed. 285. The location of a given territory within or without a state has nothing to do with whether it is Indian country so far as these liquor laws are concerned. It was held by this court in Farrell v. United States, 110 Fed. 942, 49 C. C. A. 183, that Congress did not renounce its constitutional power to regulate the traffic in intoxicating liquor with Indians and mixed-blood patentees while the United States held the title to their lands in trust for them under the Act of February 8, 1887, c. 119, 24 Stat. 388, by the fact that under that act allottees became citizens of the United States and of the state or territory in which they might reside or by any other enactment of that statute. This case would be quite controlling on many questions here; but it is contended that the Supreme Court has since decided the question the other way in the Matter of Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848. The Heff Case deals with the right to sell intoxicating liquor to an Indian allotee who has by virtue of his allotment become a citizen of the United States and of the state of his residence, but it did not deal with the power to declare an Indian allotment Indian country during the period of restriction or with the right to introduce liquor upon allotted land by means of either an intrastate or interstate shipment. In other words, it dealt wholly with the question of the right to sell liquor to a specific class of persons, and not at all with the right to introduce liquors into any given territory or with the power of Congress to define Indian country or to exclude liquor from territory defined to be such. It might, however, be somewhat persuasive on some of the points here involved were it not for the fact that in a number of cases before it since the Heff Case the Supreme Court has very clearly limited the force and scope of the holding in that case. See United States v. Celestine, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. 195; United States v. Sutton, 215 U. S. 291, 30 Sup. Ct. 116, 54 L. Ed. 200; Couture, Jr., v. United States, 207 U. S. 581, 28 Sup. Ct. 259, 52 L. Ed. 350; Tiger v. Western Investment Company, 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738. And finally in the case of Hallowell v. United States, 221 U. S. 317, 31 Sup. Ct. 587, 55 L. Ed. 750, it appeared that Hallowell was an Omaha Indian. He bought whisky off the Omaha Indian reservation and took it to his home on an allotment he had inherited. The allotment on which his home was situated was one on which the trust patent had issued; but the 25-year period of restriction on alienation had not expired. All Indians entitled to allotments on said reservation had received allotments, and much of the allotted lands had been sold to white people under the Act of May 27, 1892, 32 Stat. 245–275, and under the same act tracts

not needed for allotments had been sold to white persons. The Omaha Indians were citizens, and Hallowell had held several offices of honor and profit. It was expressly held that the allotment in question was Indian country, and that Hallowell was guilty of introducing liquor into the Indian country, in violation of the Act of January 30, 1897.

[3] A brief review of the general law as to control over the liquor traffic will make clear the object of the requirements in the enabling act of Oklahoma as to the business. Generally speaking, the control of the liquor traffic is within the police power of the states. The traffic in liquors from state to state is, however, interstate commerce, and as such within the control of Congress. Bowman v. Railway Company, 125 U. S. 465, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700; Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128.

After these decisions Congress passed the Act of August 8, 1890, 26 Stat. 313 (U. S. Comp. St. 1901, p. 3177), commonly known as the Wilson law, which provided that liquors shipped into a state or territory should upon arrival become subject to the operation of the law of such state or territory enacted in the exercise of its police power. This law was sustained in Re Rahrer, 140 U. S. 545, 11 Sup. Ct. 865, 35 L. Ed. 572; but it was subsequently held by a divided court that liquors had not arrived within a state within the meaning of this law until delivered to the consignee. Rhodes v. Iowa, 170 U. S. 412, 18 Sup. Ct. 664, 42 L. Ed. 1088. It is a matter of history that advocates of prohibition, deeming this holding an undesirable impediment to the suppression of the liquor traffic, have ever since this decision been seeking additional legislation on this subject and have contended that Congress should enact that from and after the arrival of an interstate shipment of liquor within the state of the destination of such shipment it should become subject to the police regulations of the state both before and after delivery. Congress has failed to so enact; but in the Penal Code enacted March 4, 1909, it provided, in section 238 (U. S. Comp. St. Supp. 1909, p. 1464), that any employé of a common carrier who knowingly delivered or caused to be delivered any liquor shipped into a state or territory to any person other than the consignee, or upon his written order, or to any fictitious person or to any person under a fictitious name, should be fined not more than $5,000 and imprisoned not more than two years, or both, and in section 239 prohibited common carriers from collecting the purchase price of liquors on interstate shipments or from in any way acting as agent of the buyer or seller of such liquors except in the transportation and delivery of the same under a penalty of a fine of not over $5,000, and in section 240 subjected any one who knowingly makes an interstate shipment of liquors unless the outside cover plainly shows the name of consignee, the nature and quantity of its contents, to a fine of not more than $5,000 and forfeiture of all such liquor. This history explains why the Oklahoma enabling act contained the provisions quoted.

Generally speaking, the liquor traffic within a state is within the control of that state, while shipments from without to within the state

are under the control of the Congress of the United States. The government bound by its obligations to its wards who were, as it was hoped, gradually emerging from the necessity for guardianship, and by its solemn engagements with the Seminoles and the Creeks was unwilling that there should be any conflict between its duty to the Indians and the action of the new state, and as a condition of its admission required the new state to solemnly pledge itself to prohibit the entire liquor traffic throughout the Indian Territory for a period of 21 years. It thus avoided all conflict of policy between it and the new state and secured its co-operation so far as intrastate shipments were concerned; but it must be presumed that Congress knew that the state could not prevent interstate shipments of liquor, and that that could only be done by the Congress itself. If the enabling act repealed as to Indian Territory the Act of 1897 and all other laws prohibiting the introduction of liquor into the Indian country, then Congress, while requiring Oklahoma to prohibit shipments of liquors from points within the state, at the same time authorized all the other states to flood that region with liquors. It is well known that the courts are unwilling to hold a law to have been repealed by implication unless a new law is distinctly repugnant thereto. Ex parte Crow Dog, 109 U. S. 556, 3 Sup. Ct. 396, 27 L. Ed. 1030.

Even if it should be held that by the enabling act Congress turned over to the state the suppression of the liquor traffic between other points in Oklahoma and Indian Territory, that would not tend to show that Congress intended to abandon the power it alone could exercise of suppressing the traffic between other states and Indian Territory. The Act of 1897 was valid under the power to regulate commerce with the Indian tribes. Hallowell v. United States, 221 U. S. 317, 31 Sup. Ct. 587, 55 L. Ed. 750. So far as the introduction of liquor from other states was concerned, it was valid as a regulation of interstate commerce. The Lottery Case, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492. It has not been repealed expressly or by implication.

The case is reversed and remanded, with directions to the District Court to dismiss the petition.