UNITED STATES v. SANDOVAL.

(District Court, D. New Mexico. July 22, 1912.)

No. 14.

*(Syllabus by the Court.)*

1. UNITED STATES (§ 1*)—NATURE OF GOVERNMENT—EQUAL STATES.
   The American form of government contemplates a union of equal states.
   [Ed. Note.—For other cases, see United States, Cent. Dig. § 1; Dec. Dig. § 1.*]

2. STATES (§ 9*)—ADMISSION—POWER OF CONGRESS.
   Congress may not, save in the exercise of a power conferred by the Constitution, reserve to itself, in the admission of a new state, police power exercised by the other states.
   [Ed. Note.—For other cases, see States, Cent. Dig. § 4; Dec. Dig. § 9.*]

3. INTOXICATING LIQUORS (§ 1*)—REGULATION OF TRAFFIC—POLICE POWER.
   The regulation of the sale of liquor is an exercise of the police power.
   [Ed. Note.—For other cases, see Intoxicating Liquors, Cent. Dig. § 1; Dec. Dig. § 1.*]

4. STATES (§ 4*)—POWER OF STATES—REGULATION OF LIQUOR TRAFFIC—POLICE POWER.
   Where such sale affects citizens of a state upon premises unconditionally owned by such citizens, the exercise of the police power thereover is ordinarily for the state, not for the nation.
   [Ed. Note.—For other cases, see States, Cent. Dig. § 2; Dec. Dig. § 4.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. INDIANS (§ 31*)—CITIZENSHIP ON CESSION OF TERRITORY.

The Pueblo Indians of New Mexico were considered citizens of the republic of Mexico, and under the treaty of ·Guadalupe Hidalgo of 1848 they became citizens of the United States.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 23; Dec. Dig. § 31.*]

6. INDIANS (§ 14*)—LANDS—TITLE.

The Pueblo Indians of New Mexico hold their lands by unconditional patents from the United States, issued in recognition of titles granted them by the government of Spain centuries ago.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 31–36, 46; Dec. Dig. § 14.*]

7. INDIANS (§ 35*)—INTRODUCTION OF LIQUOR INTO "INDIAN COUNTRY"—POWER OF CONGRESS.

As to such Indians holding their lands under such tenure, it was not within the power of Congress, in admitting New Mexico as a state, to declare such lands Indian country, or to reserve to the federal government the power to regulate the liquor traffic with such Indians; the latter being a part of the police power, which necessarily went to the state upon its admission.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 61, 62; Dec. Dig. § 35.*

For other definitions, see Words and Phrases, vol. 4, pp. 3545–3549.]

8. INDIANS (§ 35*)—INTRODUCTION OF LIQUOR INTO INDIAN TERRITORY—POWER OF CONGRESS.

The provisions of the New Mexico Enabling Act of June 20, 1910 (36 Stat. 557, c. 310), designed to the results last named, are void.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 61, 62; Dec. Dig. § 35.*]

Felipe Sandoval was indicted for introduction of liquor into the Indian country, in violation of Act Jan. 30, 1897, c. 109, 29 Stat. 506. Demurrer to indictment sustained.

Stephen B. Davis, Jr., U. S. Atty., and Herbert W. Clark and Leroy O. Moore, Asst. U. S. Attys.

Francis ·C. Wilson, Sp. U. S. Atty., for Pueblo Indians of New Mexico.

Renehan & Wright, for defendant.

POPE, District Judge. The defendant, Felipe Sandoval, has been indicted under Act Jan. 30, 1897, c. 109, 29 Stat. 506, for "introducing liquor into Indian country, to wit, the Santa Clara Pueblo." The portion of. that act here relevant is as· follows:

"That any person who shall sell, give away, dispose of, exchange, or barter any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or other intoxicating liquor of any kind whatsoever, or any essence, extract, bitters, preparation, compound, composition, or any article whatsoever, under any name, label, or brand, which produces intoxication, to any Indian to whom allotment of land has been made while the title to the same shall be held in trust by the government, or to any Indian a ward of the government under charge of any Indian superintendent or agent, or any Indian, including mixed bloods, over whom. the government, through its departments, exercises guardianship, and any person who shall introduce or attempt to introduce any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or intoxicating liquor of any kind whatsoever

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

into the Indian country, which term shall include any Indian allotment while the title to the same shall be held in trust by the government, or while the same shall remain inalienable by the allottee without the consent of the United States, shall be punished by imprisonment for not less than sixty days, and by a fine of not less than one hundred dollars for the first offense and not less than two hundred dollars for each offense thereafter."

A demurrer has been interposed, which attacks the indictment as stating no offense against federal law. It seems clear that, independent of certain legislation, to be presently considered, surrounding the admission of New Mexico as a state, the demurrer would have to prevail. The precise question was considered by the Supreme Court of New Mexico in United States v. Mares, 14 N. M. 1, 88 Pac. 1128, being a prosecution under the act of 1897 for selling liquor to a Pueblo Indian, and it was there held, upon what we believe to be adequate reasoning, that the Pueblo Indians are not within the terms of the act of 1897. This much is not seriously contested.

The real controversy arises upon certain provisions of Act June 20. 1910, c. 310, 36 Stat. 557, enabling the people of New Mexico and Arizona to form a constitution and state government. It is therein enacted that the constitution of New Mexico to be framed shall provide—

"by an ordinance irrevocable without the consent of the United States and the people of said state * * * that * * * the sale, barter, or giving of intoxicating liquors to Indians and the introduction of liquors into Indian country, which term shall also include all lands now owned or occupied by the Pueblo Indians of New Mexico, are forever prohibited."

The act further requires a similar ordinance to the effect—

"that the people * * * forever disclaim all right or title to * * * all lands lying within said boundaries owned or held by any Indian or Indian tribes the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the United States."

It is further required by the act that the Constitution as framed shall contain an ordinance providing—

"that whenever hereafter any of the lands contained within Indian reservations or allotments in said proposed state shall be allotted, sold, reserved or otherwise disposed of, they shall be subject for a period of 25 years after such allotment, sale, reservation or other disposal to all the laws of the United States prohibiting the introduction of liquor into Indian country, and the term 'Indian country' shall include the Pueblo Indians of New Mexico and the lands now owned or occupied by them."

The Constitution of New Mexico as framed and approved by the President of the United States contains ordinances (declared to be irrevocable without the consent of the United States and the people of the state) containing in so many words the above-quoted provisions required by the Enabling Act. There is no doubt that those several provisions are broad enough to constitute lands now owned or occupied by the Pueblo Indians Indian country. If, therefore, the terms of the Enabling Act are to be given the effect resulting from its language, the indictment is good; otherwise not.

This brings up for determination the highly important and delicate question of the power of Congress to impose upon the admission of New Mexico the terms above disclosed. The solution of this involves a careful consideration of the status of the Pueblo Indians of New Mexico and of their land tenure. These questions, while most interesting, are largely fallow field. A long line of decisions has covered the subject. The first case discussing the matter was United States v. Lucero, 1 N. M. 422, decided in 1869. There the defendant was sued for the penalty imposed by Intercourse Act June 30, 1834, c. 161. 4 Stat. 730, for settling on lands belonging to "the Pueblo tribe of Indians of the pueblo of Cochiti." In sustaining a demurrer to the petition, the Supreme Court of New Mexico, speaking through Chief Justice Watts, points out radical differences in character between the Pueblo Indians and what are known as the tribal Indians, saying:

"They [the Spanish adventurers] found the Pueblo Indians, on their advent into New Mexico, a peaceful, quiet, and industrious people, residing in villages for their protection against the wild Indians, and living by the cultivation of the soil."

As to their land holdings it is pointed out that the Spanish acknowledged their title to the land upon which they were residing, and evidenced this by a written agreement dated as far back as 1689. 1 N. M. 445. The Lucero opinion further shows that so long as the Spanish rule continued in America these titles were respected, and that when Mexico became independent of Spain the Plan of Iguala, of February 24, 1821, conferred citizenship upon these Indians in the following declaration:

"That all the inhabitants of New Spain, without distinction, whether Europeans, Africans, or Indians, are citizens of this monarchy, with a right to be employed in any post according to their merit and virtues."

It is further pointed out that on September 17, 1822, the Mexican Congress passed a preamble and act carrying into effect the fundamental principles of the Plan of Iguala in the following language:

"The sovereign Mexican constitutional congress, with a view to give due effect to the twelfth article of the Plan of Iguala, as being one of those which form the social basis of the edifice of our independence, has determined to decree and does decree:

"Article 1. That in any register, and public and private documents, on entering the name of citizens of this empire, classification of them with regard to their origin shall be omitted."

The Supreme Court of the United States in United States v. Ritchie, 17 How. 525, 15 L. Ed. 236, quoted in the Lucero Case, gives the reason for these provisions conferring citizenship upon the Indians without distinction of race as follows:

"The Indian race having participated largely in the struggles resulting in the overthrow of the Spanish power and in the erection of an independent government, it was natural that, in laying the foundations of the government, the previous political and social distinction in favor of the European or Spanish blood should be abolished and the equality of rights and privileges established. Hence the article to this effect in the plan of Iguala and the decree of the first congress declaring the equality of civil rights, whatever may be their race or country. These solemn declarations of the political power of the government had the effect necessarily to invest the Indians

with the privileges of citizenship as effectually as had the Declaration of Independence of the United States of 1776 to invest all those persons with these privileges residing in the country at the time and who adhered to the interest of the colonies."

When New Mexico became a portion of the United States under the treaty of Guadalupe Hidalgo in 1848, the guaranties of that treaty were to the effect that the citizens of New Mexico "can remain in New Mexico or remove to Mexico," and in either event their property rights are to be "inviolably respected." Recognizing the obligations imposed by the treaty, Congress in the eighth section of the act of July 22, 1854 (10 Stat. 308, c. 103), made it the duty of the Surveyor General of New Mexico to—

"make a report in regard to all Pueblos existing in the territory, showing the extent and locality of each, stating the number of inhabitants in the said pueblos respectively and the nature of their title to the land, * * * which report shall be laid before Congress for such action thereon as may be deemed just and proper with a view to confirm bona fide grants and give full effect to the treaty of 1848 between the United States and Mexico."

The Lucero opinion shows that under this direction of Congress the Surveyor General examined and reported upon the titles of the pueblos of New Mexico, finding 21 pueblos in all, with a total population of about 8,000 souls. He recommended the titles of 17 pueblos for confirmation as bona fide titles, among such being Santa Clara, the pueblo named in the present indictment; and Congress on December 22, 1858 (11 Stat. 374, c. 5), confirmed the titles as recommended, directing patents to issue, containing the following proviso:

"Provided, that this confirmation shall only be construed as a relinquishment of all title and claim of the United States to any of said lands, and shall not affect any adverse valid rights, should such exist."

The public records show that patents issued in 1864 to most of those pueblos, including Santa Clara, covering what is known as the Indian league (being a league to each cardinal point from the church). Continuing its opinion the court says:

"This court has known the conduct and habits of these Indians for 18 or 20 years, and we say, without the fear of successful contradiction, that you may pick out 1,000 of the best Americans in New Mexico, and 1,000 of the best Mexicans in New Mexico, and 1,000 of the worst Pueblo Indians, and there will be found less, vastly less, murder, robbery, theft, or other crimes among the 1,000 of the worst Pueblo Indians than among the 1,000 of the best Mexicans or Americans in New Mexico. The Associate Justice now beside me, Hon. Joab Houghton, has been judge and lawyer in this territory for over 20 years, and the Chief Justice for over 17 years, and during all that time not 20 Pueblo Indians have been brought before the courts in all New Mexico, accused of violation of the criminal laws of this territory. * * * A law made for wild, wandering savages, to be extended over a people living for three centuries in fenced abodes and cultivating the soil for the maintenance of themselves and families, and giving an example of virtue, honesty, and industry to their more civilized neighbors, in this enlightened age of progress and proper understanding of the civil rights of man, is considered by this court as wholly inapplicable to the Pueblo Indians of New Mexico."

In the course of the opinion is found the following language:

"For centuries, the Pueblo Indians have lived in villages, in fixed communities, each having its own municipal or local government. As far as their history can be traced, they have been a pastoral and agricultural people, raising flocks and cultivating the soil. Since the introduction of the Spanish Catholic missionary into the country, they have mainly been taught, not only the Spanish language, but the religion of the Christian church. In every pueblo is erected a church, dedicated to the worship of God, according to the form of the Roman Catholic church, and in nearly all is to be found a priest of this church, who is recognized as their spiritual guide and adviser. They manufacture nearly all their blankets, clothing, agricultural and culinary implements, etc. Integrity and virtue among them is fostered and encouraged. They are as intelligent as most nations or people deprived of means or facilities for education. Their names, their customs, and their habits are similar to those of the people in whose midst they reside, or in the midst of whom their pueblos are situated. The criminal records of the courts of the territory scarcely contain the name of a Pueblo Indian. In short, they are a peaceable, industrious, intelligent, honest, and virtuous people. They are Indians only in features, complexion, and a few of their habits; in all other respects superior to all but a few of the civilized Indian tribes of the country, and the equal of the most civilized thereof. This description of the Pueblo Indians, I think, will be deemed by all who know them as faithful and true in all respects. Such was their character at the time of the acquisition of New Mexico by the United States, and such is their character now."

It is further said:

"The Plan of Iguala, adopted by the revolutionary government of Mexico, 24th February, 1821, declares 'that all the inhabitants of New Spain, without distinction, whether Europeans, Africans, or Indians, are citizens of this monarchy, with a right to be employed in any post according to their merit and virtues,' and that 'the person and property of every citizen will be respected by the government.' The treaty of Cordovia, 24th August, 1821, and the Declaration of Independence of 28th September, 1821, reaffirmed these principles, as subsequently did the first Mexican Congress, by two decrees, one adopted 24th of February, 1822, the other 9th of April, 1823. The first: 'The sovereign congress declares the equality of civil rights to all the free inhabitants of the empire, whatever may be their origin in the four quarters. of the earth.' The other reaffirms the three guaranties of the Plan of Iguala: (1) Independence; (2) the Catholic religion; and (3) union of all Mexicans of whatever race. By an act of September 17, 1822, to give effect to the Plan of Iguala, it was provided that, 'in the registration of citizens, classification of them with regard to their origin shall be omitted,' and that there shall be no distinction of class on the parochial books. Upon the subject of citizenship of Mexico of the Indian races, in the case in the Supreme Court of United States v. Ritchie, Justice Nelson, who delivered the opinion of the court, says: 'These solemn declarations of the political power of the government had the effect necessarily to invest the Indian with the privileges of citizenship as effectually as had the declaration of independence of the United. States of 1776 to invest all those persons with these privileges residing in the country at the time, and who adhered to the interests of the colonies.'"

Concluding its very full opinion, the court says:

"That the Pueblo Indians were declared at that time 'Mexicans' and citizens, that they were recognized as such, no one familiar with the history of the Mexican government can question. That they are still recognized as citizens of the republic of Mexico is evidenced by the fact that the present president of that republic is a full-blood Pueblo Indian. * * * They, although still called Indians, have never, since the acquisition of this territory,

been subject to such legislation as that authorized by the Constitution, and found in the intercourse act of Congress. They should be treated, not as under the privilege of the government, but as citizens, not of a state or territory, but of the United States of America."

The same subject was considered by the Supreme Court of New Mexico in 1874, in United States v. Santistevan, 1 N. M. 583, and in United States v. Joseph, 1 N. M. 593. Each of those cases involved the question of whether the Indians of the pueblo of Taos were within the terms of the Intercourse Act, and in each instance it was held that they were not. In the Santistevan Case, at page 590 of 1 N. M., it is said:

"Those inhabitants of this territory, commonly known as the Pueblo Indians, were transferred with this territory by Mexico to the United States by the treaty of Guadalupe Hidalgo, February 2, 1848, and, according to the terms of that treaty, have the same relations to the United States which they had to the republic of Mexico, both as regards their persons and property, at the time of the treaty. These relations can only be modified, regulated, or changed by Congress in accordance with the terms of this treaty. Articles 8 and 9 of this treaty contain the guaranties entered into by the United States as to persons and property transferred by Mexico to the jurisdiction of the former, and by them are secured to all such persons the same rights of property as are enjoyed by all citizens of the United States, and to such persons as should not elect within the time specified in the treaty to retain the character of Mexican citizens admission "to the enjoyment of all the rights of citizens of the United States according to the principles of the Constitution." According to the decree dated at Iguala, February 24, 1821 (section 12), these Pueblo Indians were made citizens of New Spain, which afterwards became the republic of Mexico. This section reads thus: 'Todos los habitantes de la Nueva Espana, sin distincion alguna de Europeos, Africanos ni Indios, son ciudadanos de esta monarquia, con opcion a todo empleo segun su merito y virtudes'—which is translated: 'All the inhabitants of New Spain, without any distinction of Europeans, Africans or Indians, are citizens of this monarchy, with eligibility to every office, according to their merits and virtues.' It might cursorily seem that the wild Indians are included in the term 'Indians,' in this section; but such is not the fact, as by the usage of Mexicans the term 'habitantes' is limited to persons having a place of abode, and does not embrace vagrants or nomads. The Pueblo Indians, however, had places of abode, and, consequently, came within this section, and were made citizens by it. The thirteenth section of the same decree says: 'Las personas de todo ciudadanos y sus propiedades seran respetadas y protegidas por el gobierno'—which is in English: 'The persons and property of every citizen shall be respected and protected by the government.' These quotations are from Galvani's collection of decrees, etc., of the Mexican nation, and others of like effect may be made from the same work. The term 'propiedades' in Mexican law means property of all kinds, real, personal, and mixed. The quotations above made show that the Pueblo people, or town Indians, were considered citizens, and that as to persons and properties there was no distinction made on account of origin, race, or caste, and the same work shows that, when the Mexican nation changed their monarchy of New Spain into the republic of Mexico, the status of these citizens with regard to persons and property was affirmed."

These cases went to the Supreme Court, and in United States v. Joseph, 94 U. S. 614, 24 L. Ed. 295, it is held, affirming the judgments below, that the Pueblo Indians of New Mexico hold complete title to their land, and are not Indian tribes within the meaning of the Intercourse Act of 1834. Quoting with approval certain expressions above reproduced from the Lucero Case, the court says:

198 F.—35

"When it became necessary to extend the laws regulating intercourse with the Indians over our new acquisitions from Mexico, there was ample room for the exercise of those laws among the nomadic Apaches, Comanches, Navajoes, and other tribes whose incapacity for self-government required both for themselves and for the citizens of the country this guardian care of the general government. The Pueblo Indians, if, indeed, they can be called Indians, had nothing in common with this class. The degree of civilization which they had attained centuries before, their willing submission to all the laws of the Mexican government, the full recognition by that government of all their civil rights, including that of voting and holding office, and their absorption into the general mass of the population (except that they held their lands in common), all forbid the idea that they should be classed with the Indian tribes, for whom the Intercourse Acts were made, or that in the intent of the act of 1851 its provisions were applicable to them. The tribes for whom the act of 1834 was made were those semi-independent tribes whom our government has always recognized as exempt from our laws, whether within or without the limits of an organized state or territory, and, in regard to their domestic government, left to their own rules and traditions; in whom we have recognized the capacity to make treaties, and with whom the governments, state and national, deal, with a few exceptions only, in their national or tribal character, and not as individuals. If the Pueblo Indians differ from the other inhabitants of New Mexico in holding lands in common, and in a certain patriarchal form of domestic life, they only resemble in this regard the Shakers and other communistic societies in this country, and cannot for that reason be classed with the Indian tribes of whom we have been speaking."

Considering the title under which these Indians held their land, the court proceeds:

"We find that it is wholly different from that of the Indian tribes to whom the act of Congress applies. The United States have not recognized in these latter any other than a passing title, with right of use, until by treaty or otherwise that right is extinguished. And the ultimate title has been always held to be in the United States, with no right in the Indians to transfer it, or even their possession, without consent of the government. It is this fixed claim of dominion which lies at the foundation of the act forbidding the white man to make a settlement on the lands occupied by an Indian tribe. The Pueblo Indians, on the contrary, hold their lands by a right superior to that of the United States. Their title dates back to grants made by the government of Spain before the Mexican Revolution—a title which was fully recognized by the Mexican government, and protected by it in the treaty of Guadalupe Hidalgo, by which this country and the allegiance of its inhabitants were transferred to the United States. With the purpose of carrying into effect this provision of that treaty, Congress directed the Surveyor General of New Mexico to make inquiry into all grants of the Spanish and Mexican governments, and to report to that body on their validity. Such reports were made from time to time, one of which included, and recommended for confirmation, this claim of 'the pueblo of Taos, in the county of Taos'—not the Pueblo Indians of Taos, but the pueblo of Taos; and by an act of Congress of December 22, 1858 (11 Stat. 374), the title was confirmed, and the Commissioner of the Land Office ordered to 'issue the necessary instructions for the survey of all of said claims, as recommended for confirmation by the said Surveyor General, and cause a patent to issue therefor, as in ordinary cases to private individuals: Provided, that this confirmation shall only be construed as a relinquishment of all title and claim of the United States to any of said lands, and shall not affect any adverse valid rights, should such exist.' It is unnecessary to waste words to prove that this was a recognition of the title previously held by these people, and a disclaimer by the government of any right of present or future interference, except such as would be exercised in the case of a person holding a competent and perfect title in his individual right."

The status of the Pueblo Indians was a matter of further consideration by the Supreme Court of New Mexico in the Pueblo Indian Tax Case, 12 N. M. 139, 76 Pac. 307. There the court held the lands of these Indians to be subject to taxation. Citing the cases above referred to, it is pointed out that the Spanish conquerors "found them a peaceful, industrious, and civilized people, living in towns (pueblos) and following agricultural and pastoral pursuits." Nevertheless, it is said, "they seemed to have been considered by the Spanish as wards of the government and entitled to special privileges and protection," so that, while the Spanish crown as early as 1689 granted them certain lands, "certain restrictions were placed upon the alienation of their property." The court, proceeding, says:

"But a complete change took place in the status of these people when Mexico threw off the Spanish yoke. Among those engaged in that struggle for independence, this Aztec race far outnumbered the Mexicans, and its success was due in a large measure to their efforts. It was but natural and fitting that in the formation of the new government they should take a prominent, if not a leading, part, and that they should be placed upon an equal footing as to all civil and political rights."

The court, in support of its conclusion that the Pueblos were Mexican citizens, refers to the Plan of Iguala and the legislation of that period passed by Mexican authority (much of which has been above referred to), and says as to their present status:

"It is a matter of history, gathered by the writer from conversations with early residents of the country, that these people were, after the treaty of Guadalupe Hidalgo and down to the organization of the territory, and perhaps down to the act of 1854, supra, regarded by the people as citizens, and as possessed of all the rights of the same. They are reported to have participated in elections and held office in Pena Blanca and other places in the territory. They sat as grand and petit jurors in this same county of Bernalillo, while Judge H. S. Johnson presided over the same, at one term of court at least. It is reported that through the efforts of one John Ward, an agent appointed for them, there was a tacit agreement reached between them and the people of the counties where they resided that, as long as they refrained from voting, they should not be taxed. They thus drifted out of the political life of the territory. But no such agreement, if made, was of any binding force, either upon the Indians or the territory. We conclude, therefore, that the Pueblo Indians of New Mexico are citizens of New Mexico and of the United States, hold their lands with full power of alienation, and are, as such, subject to taxation."

In 1907 the Supreme Court of New Mexico again considered the subject in United States v. Mares, 14 N. M. 1, 88 Pac. 1128. There, as we have said above, the question was directly presented as to whether a prosecution would lie under the act of January 30, 1897, for the sale of intoxicating liquor to a Pueblo Indian. In holding that such prosecution would not lie the court says:

"The status of the Pueblo Indians of this territory has been subject to very full consideration by this court and by the Supreme Court of the United States in a number of cases. United States v. Varela, 1 N. M. 593; U. S. v. Santistevan, 1 N. M. 583; Pueblo Indian Tax Case, 12 N. M. 139 [76 Pac. 307]; United States v. Joseph, 94 U. S. 619 [24 L. Ed. 295]; quoted in Ex parte Crow Dog, 109 U. S. 572 [3 Sup. Ct. 396, 27 L. Ed. 1030]; U. S. v. Ritchie, 17 How. 525, 538 [15 L. Ed. 236]. From these decisions, the first two of which dealt with the very Pueblo here in question, their legal stand-

ing has been very definitely fixed. They have been judicially determined to be a people very different from the nomadic Apaches, Comanches, and other tribes 'whose incapacity for self-government required both for themselves and for the citizens of the country the guardian care of the general government.' They are not tribes within the meaning of the federal Intercourse Acts prohibiting settlement upon the land of 'any Indian tribe.' They are not wards of the government in the sense that this term has been used in connection with the American Indian. While Congress has as a mere gratuity from time to time provided agents and special attorneys for them, it has never attempted thereby to reduce them to a state of tutelage, or to put either them or their property under the·charge or control of the government or its agents. On the contrary, they hold their lands and property by complete and perfect title antedating the sovereignty of the United States and recognized by its unconditional patent issued to them decades ago. They have full power to alienate their lands, and these, in the absence of any act of Congress to the contrary, are subject like other property to taxation by the territory. Finally, these Indians were, at the date of the treaty of Guadalupe Hidalgo, citizens of Mexico and of the United States. This being the status of the Pueblo Indians, as fixed by the decisions of this court and of the Supreme Court of the United States, it only remains to be determined whether the sale of intoxicating liquors to them is within the prohibition of the act of January 30, 1897 (29 Stat. 506, 3 Fed. St. Ann. 384). That act makes it penal to sell or give intoxicants to 'any Indian to whom allotment of land has been made while the title to the same shall be held in trust by the government, or to any Indian a ward of the government under the charge of any Indian superintendent or agent, or to any Indian, including mixed bloods, over whom the government, through its departments, exercises guardianship.' It is a sufficient answer to the present appeal to·say that in our judgment the Pueblo Indians, as defined by the decisions above referred to, do not come within any of the three classes above referred to. The title to their lands is not held in trust by the government; they are not wards of the government, nor are they under the charge of any Indian superintendent or agent; they are not Indians over whom the government, through its . departments, exercises guardianship."

[8] It thus being clear, in the light of the history of the Pueblos, that independent of the Enabling Act the sale of liquor to Pueblo Indians is not within the legislation of Congress, what effect, in the light of that history, have the provisions of the Enabling Act above quoted? For the government it is urged that the stipulations of the Enabling Act and of the state Constitution that pueblo lands shall constitute Indian country, and shall be subject to the exclusive jurisdiction of the United States, is valid upon the following reasons: That Congress is vested with plenary power to legislate as to the territories, and therefore has the constitutional right to segregate, in forming a new state, such areas as it sees fit, and to assume entire control of these latter in so far as this does not take from the owners of the land the right to possess and enjoy it as citizens of the United States, and that in making this provision as to Pueblo Indians' lands it has acted within such claim of constitutional powers. On the other hand, it is said by the defendant that restraint upon the sale of intoxicants is an exercise of the police power; that upon the creation of a new state the exercise of this power becomes one for the new sovereignty, and cannot, save under exceptional circumstances, be reserved by the general government; and that no such reservation can be made, as is here asserted, as to a people who are citizens, not wards, and as to lands held not by governmental per-

mission, contract, or sufferance, but by fee-simple title long ante-dating American sovereignty. It is further urged that New Mexico, in entering the Union, entered upon an equality with other states, and that it was and would be imposing an unwarranted condition, detract-ing from that equality, to say that a portion of the private property of the citizens of the state shall indefinitely, perhaps forever, be with-held from the police power of the new sovereignty.

The argument for the defense impresses me as serious, and upon careful consideration as persuasive, and leads to the decision that the demurrer must be sustained. To hold otherwise is to disregard, not only what impress me as well-defined principles, but also what consti-tute controlling precedents.

[1-7] Among the constitutional powers confided to Congress is that of creating new states from national territory. This, however, is to be exercised in a manner consistent with our form of government. The latter contemplates a union of equal states. Conditions may not be imposed upon admission that detract from this equality, save only where the provisions of the Constitution permit such conditions. When this latter situation is present, the conditions cannot accurately be said to interfere with this equality, since they derive their permis-sibility from a source as high as the principle of equality itself, to wit. the Constitution. Prima facie the withholding of a purely police power exercised by all the other states is void, since it has the effect to that extent to admit the state with less power over its people and over areas within its boundaries than is enjoyed by other states. As illustrative of the matter, suppose that Congress in admitting a state should reserve to itself the power to punish for all larceny committed upon lands owned by American citizens of German ancestry, or sup-pose it should reserve to itself the power to punish for all assaults committed within lands owned by American citizens of Italian birth. In each instance, of course, the regulation of the crime is a matter for the police power. Equally clear is it that to carve out of the police power of the state either of these matters would be to leave for delivery to the state only an incomplete sovereignty. A court in dealing with such a matter would hardly hesitate to hold that such reservation would be void, and as to the propriety of such a conclu-sion there would scarcely be a difference of opinion.

The distinction pressed upon us between what has just been sug-gested and the situation here involved is, however, that the land now sought to be reserved from the police power belongs to Indians, and may within the constitutional powers be created and perpetuated as Indian country, subject to federal control. In other words, it is said that, because an Indian is involved, constitutional power existed in Congress to place upon the state the condition that what was previ-ously not Indian country must henceforth be deemed such as a condi-tion to admission. But from what constitutional source proceeds the power of Congress to legislate as to the Indians? The origin of this power is suggested by District Judge Marshall in United States v. Boss (D. C.) 160 Fed. 132, when in referring to the liquor statute of January 30, 1897, he says:

"If it is to apply within a state it must be because of the status of the Indians for whose protection it was enacted, or of the locus of the forbidden act as being on a reservation."

The matter is more fully stated by the Eighth Circuit Court of Appeals, speaking through Circuit Judge Smith, in United States Express Co. v. Friedman, 191 Fed. 673, 112 C. C. A. 219. That case likewise deals with the matter of the Indian liquor traffic, and classifies congressional power to legislate as to the Indians as flowing from one of five sources: First, the treaty-making power; second, the power to regulate interstate commerce; third, the power to regulate commerce with Indian tribes; fourth, the ownership as sovereign of lands to which the Indian title has not been extinguished; fifth, the plenary authority arising out of the nation's guardianship of the Indians as an alien, but dependent, people.

Applying these in succession to the present situation, the power to legislate in the manner here involved cannot be attributed to the treaty-making power. The Pueblo Indians of New Mexico have never been parties to any treaty with the United States, nor has it ever been claimed that they were proper subjects for a treaty. Neither can this power exist as a result of the right to regulate interstate commerce. The stipulation of the Enabling Act applies indifferently to the introduction of intoxicants from within or without state lines, and it is not pretended that in the present case the liquor introduced was introduced from without the state of New Mexico. The power here asserted cannot be sustained as an exercise of the right to regulate commerce with Indian tribes. As we have seen, the Pueblo Indians are not tribes within the meaning of the Constitution. It cannot be upheld as a result of federal ownership of lands to which the Indian title has not been extinguished; for, as we have seen, the American government never owned the lands in question.

Nor can it flow from what the Circuit Court of Appeals has called "the plenary authority arising out of its guardianship of the Indians as an alien, but dependent, people." The Pueblos have never been wards of the nation. As we have seen, they occupied to some extent that position under the Spanish régime; but beginning with the independence of the Mexican nation in 1821 they became citizens, and when New Mexico became a part of our national domain they came under our sovereignty as citizens, and not as wards. No act of theirs, nor of our government since the treaty of Guadalupe Hidalgo, has changed their status, so as to subject them to national guardianship or to make them an alien and dependent people. True, as pointed out in United States v. Lucero, supra, Congress in 1854 appropriated $10,000 to make them presents of agricultural implements and farming utensils. Act July 31, 1854, c. 167, 10 Stat. 330. True, in 1857 Congress appropriated $3,750 for "expenses of surveying and marking the external boundaries of the Indian pueblos in the territory of New Mexico." Act March 3, 1857, c. 90, 11 Stat. 184. True, an attorney has of late years been provided for them at the expense of the government. Act March 3, 1909, c. 263, 35 Stat. 799. True, also, Congress, after the decision in the Pueblo Indian Tax Case, above

mentioned, relieved them from the payment of any taxes to the territory of New Mexico. 33 Stat. 1069. But these acts fall far short of establishing a resumption of guardianship over the Pueblos. On the contrary, they are rather to be deemed gratuities proceeding from a generous government to a poor, but deserving, portion of our population. The appropriations referred to in the first three instances were by Congress in the exercise of its constitutional power to appropriate the public moneys; the last, in the exercise of its power to legislate for the territories. Congress could with equal power have passed these acts in the interest of citizens not Indians, and the mere fact that they were Indians does not result in placing them in a condition of tutelage.

We have, therefore, left, as the sole basis upon which federal jurisdiction may be retained over these people, the fact that they are of Indian lineage. Is this enough? There is, from a governmental standpoint, no magic in the word "Indian." It has through the course of our legislation indicated a condition no less than a race. With the condition gone by the assimilation of the person into the body politic, and the release of his lands from governmental control by the issuance of unconditional patents, his race loses significance. If the mere fact that he be an Indian is of itself sufficient to justify his being held always subject to a species of federal police power, that power would seem, likewise, logically to extend to his remote posterity; for they, like him, have Indian blood in their veins calling for the national guardianship. The length to which this would go will be appreciated when we recall that high state officials and leading members of Congress have been of Indian race. Can it be that to sell to such citizens or to deliver at the home of such a citizen an intoxicant is a matter of federal concern? The question carries its own answer, and yet this is precisely what is claimed when it is asserted that to sell intoxicants to a Pueblo Indian citizen upon his own farm shall, so long as he, an Indian, owns it, be a matter to be regulated purely by Congress. Such, in my judgment, is a claim of power for Congress that it does not possess. More than this, it is a detraction from the police power properly belonging to the state, and, if upheld, has the effect to admit New Mexico shorn of powers possessed by every other state in the Union. It cannot, therefore, be sustained.

Coming to authority, two decisions of the Supreme Court seem peculiarly in point upon this question. Matter of Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848; Coyle v. Oklahoma, 221 U. S. 559, 31 Sup. Ct. 688, 55 L. Ed. 853. In the Heff Case there was a conviction for selling beer to a member of the Kickapoo tribe of Indians in Kansas. The facts showed that the party to whom the liquor was sold was a citizen of the United States and of the state of Kansas, and by reason of having received an allotment of land in severalty he was by law declared to be subject to the laws, both civil and criminal, of the state in which he resided. In deciding that under the circumstances a conviction for the sale of liquor to such an Indian under the act of Congress of January 30, 1897, could not be sustained, the court says:

"In this republic there is a dual system of government, national and state. Each within its own domain is supreme, and one of the chief functions of this court is to preserve the balance between them, protecting each in the powers it possesses, and preventing any trespass thereon by the other. The general police power is reserved to the states, subject, however, to the limitation that in its exercise the state may not trespass upon the rights and powers vested in the general government. The regulation of the sale of intoxicating liquors is one of the most common and significant exercises of the police power. And so far as it is an exercise of the police power it is within the domain of state jurisdiction. It is true the national government exacts licenses as a condition of the sale of intoxicating liquors, but that is solely for the purposes of revenue and is no attempted exercise of the police power. A license from the United States does not give the licensee authority to sell liquor in a state whose laws forbid its sale, and neither does a license from a state to sell liquor enable the licensee to sell without paying the tax and obtaining the license required by the federal statute. License Cases, 5 How. 504 [12 L. Ed. 256]; McGuire v. Commonwealth, 3 Wall. 387 [18 L. Ed. 226]; License Tax Cases, 5 Wall. 462 [18 L. Ed. 497]. Now the act of 1897 is not a revenue statute, but plainly a police regulation. It will not be doubted that an act of Congress attempting as a police regulation to punish the sale of liquor by one citizen of a state to another within the territorial limits of that state would be an invasion of the state's jurisdiction and could not be sustained, and it would be immaterial what the antecedent status of either buyer or seller was. There is in these police matters no such thing as a divided sovereignty. Jurisdiction is vested entirely in either the state or the nation, and not divided between the two."

It is further said:

"But it is contended that, although the United States may not punish under the police power the sale of liquor within a state by one citizen to another, it has power to punish such sale if the purchaser is an Indian. And the power to do this is traced to that clause of section 8, art. 1, of the Constitution, which empowers Congress 'to regulate commerce with foreign nations, and among the several states, and with the Indian tribes.' It is said that commerce with the Indian tribes includes commerce with the members thereof, and Congress, having power to regulate commerce between the white men and the Indians, continues to retain that power, although it has provided that the Indian shall have the benefit of and be subject to the civil and criminal laws of the state, and shall be a citizen of the United States, and therefore a citizen of the state. But the logic of this argument implies that the United States can never release itself from the obligation of guardianship; that, so long as an individual is an Indian by descent, Congress, although it may have granted all the rights and privileges of national and therefore state citizenship, the benefits and burdens of the laws of the state, may at any time repudiate this action and reassume its guardianship, and prevent the Indian from enjoying the benefit of the laws of the state, and release him from obligations of obedience thereto. Can it be that, because one has Indian, and only Indian, blood in his veins, he is to be forever one of a special class over whom the general government may in its discretion assume the rights of guardianship which it has once abandoned, and this whether the state or the individual himself consents? We think the reach to which this argument goes demonstrates that it is unsound."

The court concludes as follows:

"But it is unnecessary to pursue this discussion further. We are of the opinion that when the United States grants the privileges of citizenship to an Indian, gives to him the benefit of and requires him to be subject to the laws, both civil and criminal, of the state, it places him outside the reach of police regulations on the part of Congress; that the emancipation from federal control thus created cannot be set aside at the instance of the government without the consent of the individual Indian and the state; and that

this emancipation from federal control is not affected by the fact that the lands it has granted to the Indian are granted subject to a condition against alienation and incumbrance, or the further fact that it guarantees to him an interest in tribal or other property."

While it may be, as suggested in United States Express Co. v. Friedman, 191 Fed. 673–680, 112 C. C. A. 219, supra, and Mosier v. United States, 198 Fed. 54, decided April 22, 1912, by the Eighth Circuit Court of Appeals, that the scope of the Heff Case has been narrowed by later cases, the decision has not been detracted from upon the point here material, and has, indeed, been strengthened in principle by the later case of Keller v. United States, 213 U. S. 147, 29 Sup. Ct. 470, 53 L. Ed. 737, 16 Ann. Cas. 1066. See, also, Ward v. Race Horse, 163 U. S. 504, 16 Sup. Ct. 1076, 41 L. Ed. 244, and cases cited.

In Coyle v. Oklahoma the question was as to the efficacy of the Oklahoma Enabling Act of June 16, 1906 (34 Stat. 267, c. 3335), to prevent the removal of the capital by act of the state Legislature. The Enabling Act had stipulated that it should remain at Guthrie until 1913. The constitutional convention, by ordinance declared irrevocable, had accepted this as a condition of admission. But the Supreme Court held the Enabling Act to be void and the stipulation ineffectual. In dealing with the matter the court classifies the conditions which Congress has exercised the power to impose in admitting states as follows:

"We must distinguish, first, between provisions which are fulfilled by the admission of the state; second, between compacts or affirmative legislation intended to operate in futuro, which are within the scope of the conceded powers of Congress over the subject; and, third, compacts or affirmative legislation which operates to restrict the powers of such new states in respect of matters which would otherwise be exclusively within the sphere of state power."

The court proceeds:

"The only question for review by us is whether the provision of the Enabling Act was a valid limitation upon the power of the state after its admission, which overrides any subsequent state legislation repugnant thereto. The power to locate its own seat of government, and to determine when and how it shall be changed from one place to another, and to appropriate its own public funds for that purpose, are essentially and peculiarly state powers. That one of the original 13 states could now be shorn of such powers by an act of Congress would not be for a moment entertained. The question, then, comes to this: Can a state be placed upon a plane of inequality with its sister states in the Union, if the Congress chooses to impose conditions which so operate, at the time of its admission? The argument is that, while Congress may not deprive a state of any power which it possesses, it may, as a condition to the admission of a new state, constitutionally restrict its authority, to the extent, at least, of suspending its powers for a definite time in respect to the location of its seat of government. This contention is predicated upon the constitutional power of admitting new states to this Union, and the constitutional duty of guaranteeing to 'every state in this Union a republican form of government.' The position of counsel for the appellants is substantially this: That the power of Congress to admit new states and to determine whether or not its fundamental law is republican in form are political powers, and as such uncontrollable by the courts. That Congress may in the exercise of such power impose terms and conditions upon the admission of the proposed new state, which, if accepted, will be obligatory, although they operate to deprive the state of powers

which it would otherwise possess, and, therefore, not admitted upon 'an equal footing with the original states.' "

It is then further said:

"But what is this power? It is not to admit political organizations which are less or greater, or different in dignity or power, from those political entities which constitute the Union. It is, as strongly put by counsel, a 'power to admit states.' * * * This Union was and is a union of states, equal in power, dignity, and authority, each competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself. To maintain otherwise would be to say that the Union, through the power of Congress to admit new states, might come to be a union of states unequal in power, as including states whose powers were restricted only by the Constitution, with others whose powers had been further restricted by an act of Congress accepted as a condition of admission. Thus it would result, first, that the powers of Congress would not be defined by the Constitution alone, but, in respect to new states, enlarged or restricted by the conditions imposed upon new states by its own legislation admitting them into the Union; and, second, that such new states might not exercise all of the powers which had not been delegated by the Constitution, but only such as had not been further bargained away as conditions of admission."

The court further says:

"It may well happen that Congress should embrace in an enactment introducing a new state into the Union legislation intended as a regulation of commerce among the states, or with Indian tribes situated within the limits of such new state, or regulations touching the sole care and disposition of the public lands or reservations therein, which might be upheld as legislation within the sphere of the plain power of Congress. But in every such case such legislation would derive its force, not from any agreement or compact with the proposed new state, nor by reason of its acceptance of such enactment as a term of admission, but solely because the power of Congress extended to the subject, and, therefore, would not operate to restrict the state's legislative power in respect of any matter which was not plainly within the regulating power of Congress. Willamette Bridge Co. v. Hatch, 125 U. S. 1, 9 [8 Sup. Ct. 811, 31 L. Ed. 629]; Pollard's Lessee v. Hagan [3 How. 212, 11 L. Ed. 565]. No such question is presented here. The legislation in the Oklahoma Enabling Act relating to the location of the capital of the state, if construed as forbidding a removal by the state after its admission as a state, is referable to no power granted to Congress over the subject, and, if it is to be upheld at all, it must be implied from the power to admit new states. If power to impose such a restriction upon the general and undelegated power of a state be conceded as implied from the power to admit a new state, where is the line to be drawn against restrictions imposed upon new states?"

The court concludes in the following language:

"Has Oklahoma been admitted upon an equal footing with the original states? If she has, she by virtue of her jurisdictional sovereignty as such a state may determine for her own people the proper location of the local seat of government. She is not equal in power to them if she cannot. In Texas v. White, 7 Wall. 700, 725 [19 L. Ed. 227], Chief Justice Chase said in strong and memorable language that 'the Constitution, in all of its provisions looks to an indestructible Union, composed of indestructible states.' In Lane County v. Oregon, 7 Wall. 76 [19 L. Ed. 101], he said: 'The people of the United States constitute one nation, under one government, and this government, within the scope of the powers with which it is invested, is supreme. On the other hand, the people of each state compose a state, having its own government, and endowed with all the functions essential to separate and independent existence. The states disunited might continue to exist. Without the states in union there could be no such political body

as the United States.' To this we may add that the constitutional equality of the states is essential to the harmonious operation of the scheme upon which the republic was organized. When that equality disappears, we may remain a free people; but the Union will not be the Union of the Constitution."

If in the Oklahoma case the constitutional equality of a new state was invaded by a provision seeking to control for a limited time the location of its capital, it seems equally clear that that constitutional equality is interfered with in the case of New Mexico by the declaration that land held by its citizens under perfect title from a former sovereignty shall indefinitely constitute Indian country and be thus subject to federal control, to the exclusion of the police powers of the state. The possession of the police power is as essential to the full sovereignty of the state as the possession of the power to fix its seat of government.

Counsel for the government have cited a large number of cases, some of them quite recent, in which the courts have upheld the applicability of federal legislation as to Indians within the limits of a state. It is believed, however, that an examination of these cases will show that the federal power in any instance sustained was fairly referable to one or the other of the constitutional sources mentioned in the Friedman Case, supra, none of which are applicable here. Perhaps the case most nearly approximating the present one upon the facts is Dick v. United States, 208 U. S. 340, 28 Sup. Ct. 399, 52 L. Ed. 520. There the Supreme Court, reversing the lower courts, which had held that the prosecution would not lie (Ex parte Dick, 141 Fed. 5, 72 C. C. A. 667), decided that a prosecution under the liquor act of January 30, 1897, was sustainable, although the land upon which the liquor was introduced was owned in fee by citizens of such state. The court bases its decision upon the fact that the land in question was once property of the Indian tribe, and had been acquired by the United States subject to the condition that the acts of Congress relating to the introduction of liquor should remain in force over such territory for the limited period of 25 years, which period had not expired. The court says:

"In determining the extent of the power of Congress to regulate commerce with the Indian tribes, we are confronted by certain principles that are deemed fundamental in our governmental system. One is that a state, upon its admission into the Union, is thereafter upon an equal footing with every other state, and has full and complete jurisdiction over all persons and things within its limits, except as it may be restrained by the provisions of the federal Constitution or by its own Constitution. Another general principle, based on the express words of the Constitution, is that Congress has power to regulate commerce with the Indian tribes, and such power is superior and paramount to the authority of any state within whose limits are Indian tribes. These fundamental principles are of equal dignity, and neither must be so enforced as to nullify or substantially impair the other. In regulating commerce with Indian tribes, Congress must have regard to the general authority which the state has over all persons and things within its jurisdiction. So, the authority of the state cannot be so exerted as to impair the power of Congress to regulate commerce with the Indian tribes."

The power of Congress in the matter was, as the court expressly says (208 U. S. 359, 28 Sup. Ct. 405, 52 L. Ed. 520)—

"based upon the treaty-making power of the United States and upon the power of Congress to regulate commerce with those Indians, and was not inconsistent in any substantial sense, with the constitutional principle that a new state comes into the Union upon entire equality with the original states."

The court, however, in the course of the opinion is careful to say:

"If this case depended alone upon the federal liquor statute forbidding the introduction of intoxicating drinks into the Indian country, we should feel obliged to adjudge that the trial court erred in not directing a verdict for the defendant; for that statute, when enacted, did not intend by the words 'Indian country' to embrace any body of territory in which, at the time, the Indian title had been extinguished, and over which and over the inhabitants of which (as was the case of Culdesac) the jurisdiction of the state, for all purposes of government, was full and complete. Bates v. Clark, 95 U. S. 204 [24 L. Ed. 471]; Ex parte Crow Dog, 109 U. S. 556, 561 [3 Sup. Ct. 396, 27 L. Ed. 1030]."

The recent case of Clairmont v. United States, 225 U. S. 551, 32 Sup. Ct. 787, 56 L. Ed. 1201, decided June 10, 1912, by the Supreme Court of the United States, refers to the Dick Case and points out the source of the federal power there upheld. Of the other cases cited for the government, the federal power was in some instances sustained as flowing from treaty. The Kansas Indians, 5 Wall. 737, 18 L. Ed. 667; United States v. Forty-Three Gallons of Whisky, 93 U. S. 188, 23 L. Ed. 846. In still other cases cited the jurisdiction was upheld under the power of Congress to regulate commerce between the states or with Indian tribes. United States v. Holliday, 3 Wall. 409, 18 L. Ed. 182; United States Express Co. v. Friedman, 191 Fed. 673, 112 C. C. A. 219; Ex parte Charley Webb, 225 U. S. 663, 32 Sup. Ct. 769, 56 L. Ed. 1248, Supreme Court of the United States, decided June 10, 1912. In still other cases the jurisdiction was sustained upon the power flowing from the government's right to administer its own property, as, for instance, in cases arising upon a reservation, or those in which the government held title in trust, or those in which, although title had passed to the Indians, there was an express prohibition against alienation for a certain period. Farrell v. United States, 110 Fed. 942, 49 C. C. A. 183; United States v. Allen, 179 Fed. 13, 103 C. C. A. 1; Bowling v. United States, 191 Fed. 19, 111 C. C. A. 561; United States v. Celestine, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. 195; United States v. Sutton, 215 U. S. 291, 295, 30 Sup. Ct. 116, 54 L. Ed. 200; Tiger v. Western Investment Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738; Hallowell v. United States, 221 U. S. 323, 31 Sup. Ct. 587, 55 L. Ed. 750. Clairmont v. United States, supra, decided by the Supreme Court on June 10, 1912, illustrates the converse of the question, being a case in which the Indian title had without reservation been extinguished. The case of Mosier v. United States, supra (Eighth Circuit Court of Appeals, April 22, 1912), is perhaps an illustration of the power resulting from the national guardianship of the Indian as a dependent person. None of these cases, in my opinion, are applicable to the Pueblo Indians of New Mexico.

It is not overlooked, in making the present disposition of the case, that it is one of great importance to the Indians in question, and that

the effect of the decision may be to break down a safeguard which Congress and the framers of the New Mexico Constitution have attempted to provide for the Pueblo Indians. However, mere desirability of a result can furnish, as against constitutional limitation, no justification for an assumption of federal power, nor for a denial of state jurisdiction. The matter being purely one for the state, it will be assumed, as in Ex parte Dick, 141 Fed. 5, 72 C. C. A. 667, that the Legislature of the state will perform its duty in this respect. If, as suggested at the bar, state legislation already passed on the subject is fully adequate, it is to be anticipated that the state courts, by the enforcement of such statutes, will afford the Pueblo Indians the protection which Congress and the state constitutional convention have indicated a desire to give them. To assume otherwise is to say that representative government is a failure.

A judgment sustaining the demurrer and dismissing the proceedings will be entered.